## STATE v. ANSELMO.

No. 2674.   Decided May 8, 1915 (148 Pac. 1071).

1. HOMICIDE—DEFENSES—MENTAL CONDITION.   In a prosecution for homicide, the mental condition of defendant may be considered on questions of deliberation and premeditation, though his incapacity was not such as to relieve him of responsibility.   (Page 145.)

2. CRIMINAL LAW—CONTINUANCE—RIGHT.   The granting of continuance upon the grounds of excitement or bias in the community rest largely in the discretion of the trial court, whose ruling will not be disturbed, unless an abuse appears; and hence a denial of a continuance in a prosecution for the shooting of a police officer, sought on the ground that a subsequent killing had aroused public opinion, will not be reviewed where accused's showing was controverted.[1]   (Page 145.)

3. WITNESSES—TRIAL—CROSS-EXAMINATION.   While courts are loth to restrict cross-examination, it is not improper for the court to refuse to permit counsel to repeat over and over again questions upon subjects which have already been fully developed.   (Page 146.)

4. WITNESSES—TRIAL—QUESTIONS ON CROSS-EXAMINATION.   Counsel, while entitled to considerable latitute in examining witness, should not be allowed to propound and repeat improper and unfair questions.   (Page 147.)

5. CRIMINAL LAW—LEGALITY OF ARREST—QUESTION OF LAW.   Whether an officer was authorized to make an arrest, and the

---

[1]State v. Haworth, 24 Utah, 398, 68 Pac. 155; State v. Vacos, 40 Utah, 169, 120 Pac. 497; State v. Riley, 41 Utah, 225, 126 Pac. 294.

arrest was lawful or unlawful, is a question of law for the court, though the facts are in dispute, in which case the court should charge the jury in specific terms under what state of particular facts the arrest was lawful or otherwise. (Page 148.)

6. CRIMINAL LAW—LAWFUL ARREST—PRESUMPTION. Accused and another became engaged in a saloon brawl. Accused's assailant claimed that he was cut in the shoulder, and some time thereafter pointed out accused to an officer, who attempted to take him into custody. In the meantime accused had purchased a revolver, which he then had in his possession. In attempting to escape from the officer, accused killed him. Held that, where accused's assailant did not testify at trial, it cannot be inferred, in support of the legality of the arrest, that accused had committed felony in cutting his assailant, or that the officer was arresting him for violating a municipal ordinance by carrying concealed weapons. (Page 148.)

7. HOMICIDE—MURDER IN THE FIRST DERGEE—DEFENSES. That accused was illegally arrested will not justify him in taking the life of the arresting officer, unless it reasonably appeared that he was in actual danger of life or limb, other than mere danger from illegal arrest. (Page 151.)

8. HOMICIDE—TRIAL—INSTRUCTIONS. Under Comp. Laws 1907, section 4161, declaring that every willful, deliberate, malicious, and premeditated killing is murder in the first degree, it is improper to charge the jury that premeditated means thought of beforehand, for any length of time, however short, and that there need be no appreciable space of time between the intention to kill and the act; the instruction practically not giving any time for premeditation.[2] (Page 153.)

9. HOMICIDE—APPEAL—HARMLESS ERROR. In a prosecution for homicide committed by an epileptic, who at the time of the killing was under the influence of liquor, an instruction which practically did not require any premeditation, and might have misled the jury in that respect, is prejudicial, for it is the province of the jury to determine whether accused's mental condition was such as to relieve him of the extreme penalty of his act.[3] (Page 153.)

10. HOMICIDE—INSTRUCTIONS—ABSTRACT INSTRUCTIONS. In a prosecution for homicide committed by an epileptic, who was under

[2]People v. Callaghan, 4 Utah, 56, 6 Pac. 49; State v. Dewey, 41 Utah, 538, 127 Pac. 275.

[3]State v. Thorne, 39 Utah, 208, 117 Pac. 58.

the influence of liquor at the time of the killing, an instruction, in the words of Comp. Laws 1907, section 4070, declaring that no act committed by a person in a state of voluntary intoxication is less criminal by reason of his having been in such condition, but whenever the actual existence of any particular purpose, motive, or intent is a necessary element the jury may take into consideration the question of intoxication, is not sufficient, but the jury should have been given a concrete instruction applicable to the case at bar.   (Page 158.)

11.   HOMICIDE—MOTIVE—EVIDENCE.   Where accused killed an officer in attempting to escape arrest, which was the outgrowth of a saloon brawl, a black jack, revolver, masks, and sneakers, found in accused's room and identified by him, were not admissible on the question of. motive, having no bearing on his reason for killing the officer.   (Page 159.)

12.   CRIMINAL LAW—EVIDENCE OF GOOD CHARACTER—REBUTTAL.   Evidence of good character or the contrary must be confined to the general reputation of the accused; hence, in a prosecution for homocide, evidence that there was found in accused's room appliances which might be used for crime, although they were susceptible of an innocent use, is inadmissible to rebut accused's evidence of good character.[4]   (Page 159.)

13.   CRIMINAL LAW — INSTRUCTIONS — ABSTRACT INSTRUCTION.   The courts should as much as possible, avoid abstract instructions, simply directing the jury in plain terms what the result should be in case they found the facts on any issue as indicated by the court.[5]   (Page 164.)

*McCarty, J.*, dissenting in part.

Appeal from District Court, Third District; Hon. *F. C. Loofbourow*, Judge.

Giovanni Anselmo was convicted of murder in the first degree.  He appeals.

REVERSED AND REMANDED.

*Thomas Marioneaux* and *W. H. King* for appellant.

*A. R. Barnes*, Atty. Gen., and *E. V. Higgins* and *G. A. Iverson*, Asst. Attys. Gen., for the State.

---

[4]*Harrison* v. *Harker*, 44 Utah, 541, 142 Pac. 716.
[5]*Shepherd* v. *Railroad Co.*, 41 Utah, 469, 126 Pac. 692.

FRICK, J.

Giovanni (John) Anselmo, the appellant, was convicted in the District Court of Salt Lake County, Utah, of the crime of murder in the first degree, without recommendation, and was sentenced to be executed. He appeals from that judgment.

The state's evidence in chief substantially established the following facts:

At about eight o'clock on the morning of June 25, 1913, the appellant and one Pete Massi, acquaintances, both Italians, were drinking together in what is called the Shamrock Saloon at No. 217 West Second South Street, Salt Lake City. They played cards and quarreled over the game, which quarrel finally culminated in what the witnesses called a scuffle or fight. Massi, it seems, got appellant down on the floor and was standing over him when the bartender interfered, and, using his own language, ordered them to "cut it out"—told them they would not be permitted to quarrel or fight in the saloon. The two young men ceased their quarrel and came into the barroom from the room immediately in the rear thereof where the encounter took place. The appellant laid a silver dollar on the bar, and, addressing both Massi and the bartender, said: "Let's have a drink." They all drank, and Massi pushed back his coat and shirt, and referring to the fight between himself and appellant, said: "I am cut on the shoulder." The bartender says that he saw a small wound on Massi's shoulder and saw a little fresh blood. Massi then wanted to use the saloon telephone to call a police officer, but the bartender refused him the use of it, and the appellant and Massi left the saloon together. Where they went is not shown. The bartender testified that appellant had taken five drinks that morning. The state also proved that at about nine o'clock on the same morning appellant purchased a .32 Smith & Wesson revolver and a box of cartridges from one of our dealers in firearms. The price of the revolver was $18 and its number was 55578. After they parted, about ten o'clock, or a little after, the appellant went into what is known as the Shamrock Cafe, which is next door to the Shamrock Saloon. He there "jollied" one of the waiter girls, as she called it, by taking hold of her and lifting her up from

the floor, and after she had "slapped him," as she says, he sat down on a box in a small room between the kitchen and the main dining room in the cafe. The young woman testified that she observed that he had been drinking, and that he appeared pale, and was sitting on the box aforesaid, leaning forward, holding his head in his hands. The foregoing statements are substantially corroborated by another witness, also a waiter girl, who saw the appellant that morning. Both of the girls were acquainted with him. While appellant was sitting on the box, as just stated, Massi and the deceased, a member of the police force of Salt Lake City, dressed in the regulation uniform of a policeman, came into the cafe and went to where appellant was sitting. The officer, after going to appellant, put his hand on appellant's shoulder, and addressing him, said: "What is the matter, boy?" Massi then pulled his coat and shirt aside, and, pointing to and exhibiting what he called a cut on his shoulder to the officer, said: "That is what is the matter." The officer then spoke to appellant and said: "You had better come with me." Appellant replied: "Wait a minute. Let me explain." The officer said: "There will be no explanation. Wait till you get to police headquarters." The officer, appellant, and Massi then left the cafe together, going east along the sidewalk to the first intersection of the street east of the saloon, at which point there was a patrol box. The officer was in the act of going to the box, when appellant broke away from him and ran south along the street running north and south until he reached an open space, where he turned to the west. The officer and Massi, in the order named, followed appellant, and when they had reached a point in the open space aforesaid in the rear of what is called Sweet's Candy Establishment, and the officer was within a few feet of appellant, the latter turned and fired three shots at the officer, all of which lodged in his body. The one causing death passed in at the front and near the top of the forehead, and, passing through the brain, lodged a little back of the ear. This bullet, the doctor testified, caused a fatal wound and produced almost instantaneous death.

There were at least three eyewitnesses to the shooting, and while there are the usual discrepancies in such cases the fore-

going substantially covers the material facts developed by the evidence. The shooting occurred some time between ten and eleven o'clock on the morning aforesoid. We remark that some effort was made by counsel for appellant to show that appellant was threatened with violence by the officer at the time of the shooting, but a careful reading of the evidence in the original bill of exceptions convinces us that there is no evidence whatever upon which the jury could have based such a conclusion. The only inference that is permissible from the whole evidence is that the appellant shot the deceased to avoid being taken to the police station, which the deceased was in the act of doing when appellant broke away from him as before stated.

Appellant made his escape, but was found in a shanty in the rear of his aunt's dwelling between nine and ten o'clock on the night of the day of the shooting. When he was arrested by the police officers, the revolver which he had bought in the morning, together with a duplicate "sale slip," were in his possession, and at the time of the arrest he was apparently again attempting to use the revolver. In making the arrest appellant was wounded by a shot fired by one of the officers. He was taken to the Salt Lake County Jail immediately after his arrest, where he was constantly confined until the time of his trial, in December, 1913.

The evidence produced on behalf of appellant relating to his mental condition is substantially as follows:

At the time of the trial he was twenty-one years of age. He is an Italian by birth, and came to the United States in 1910 with a friend of his father. His father, with an older brother of appellant, lived in Salt Lake City, and had lived there for some years when appellant came to this country. The evidence, without dispute, was to the effect that appellant is what is called an epileptic; that he suffered from epileptic attacks from childhood up to the time that he shot the deceased in 1913; that the attacks had been less frequent and less violent in the later years; that his mother was a daughter of a confirmed drunkard, who died at the age of twenty-eight years from alcoholism, and was also an epileptic and regarded of unsound mind; that appellant's grandmother was an epileptic

and became insane; that an uncle on the mother's side was also an epileptic, and died before reaching the age of forty years, and only two days after an epileptic attack; that said uncle had two daughters, both of whom were epileptics; that another uncle had four daughters, all of whom were neurotics and epileptics; that the children of those daughters were afflicted with epilepsy and were sickly; that appellant's mother is an epileptic, and, in the town in Italy where she lives, is regarded of unsound mind; that appellant's father as a child was afflicted with epilepsy, and the testimony is to the effect that mentally he is abnormal; that the father's father, appellant's grandfather, died at the age of forty-two years from alcoholism, and for some years before his death was regarded as of unsound mind; that the latter's daughter, one of appellant's aunts, was an epileptic and died insane; that she had but one child, and it was subject to "convulsions," and died at the age of two years; that the father's mother, appellant's grandmother, was an epileptic, and died of senile dementia; that she had two brothers, the son of one of whom was· an epileptic, while the other one of the two brothers was a neurotic; that an older brother was afflicted with epilepsy until he was eight years of age, after which time his mind became weak and he has practically become what is termed "silly and idiotic"; that the youngest sister of appellant has been afflicted with epileptic attacks ever since infancy, and is partially paralyzed. The foregoing statements are gleaned from the depositions of doctors, public officials, and business men living in Italy who were acquainted with the Anselmo family and their relatives. There were also other witnesses who lived in Salt Lake City who testified to appellant's epileptic attacks in 1910 and explained his mental condition to the jury. There was also a large volume of testimony from persons living in Italy, as well as from some living in Salt Lake City, to the effect that appellant had always borne a good reputation, and that he was quiet, law-abiding and a peaceable young man. There was also testimony from the landlady of the house in which appellant and his father rented the room in which they lived at the time of the homicide that the appellant was kind and affectionate, that he was quiet, and that

his reputation for peaceableness and quiet was good, and that he had spent his evenings at home.   There was also evidence by experts, who testified both for appellant and for the state, explaining fully to the jury the effect of epilepsy on the mind, and how alcoholic stimulants generally affect epileptics.

The appellant also gave his version of the drinking and quarrel with Massi at the saloon, his arrest by the deceased in the morning, of the shooting afterwards, and of his flight and consequent arrest at night.   It is not deemed necessary to state further the evidence in that regard, except to state that according to his statement, he had taken six drinks of whiskey before the arrest was attempted by the deceased, and that his system was not in a condition to withstand the effects of alcohol; that he was confused and frightened after his quarrel with Massi.

Three doctors, who had examined the appellant several times after the homicide and before the trial, also testified that he had an enlarged thyroid, that his head was somewhat deformed, and that affections of the thyroid had a tendency to produce various diseases.   At least two of the doctors called as experts by the defendant went into great detail respecting the effect a diseased thyroid has on the mind and nervous system.   After the doctors had testified fully respecting epilepsy and its effects, counsel for the appellant propounded to Dr. Mayo, one of the experts, a hypothetical question containing fully 6,000 words, in which defendant's diseases, idiosyncrasies, weaknesses, and, in short, his life's history as disclosed from the evidence, was detailed, and the question concluded by asking the doctor "whether or not, in your opinion the defendant, during the period and at the time when the shots were fired, was of sound or unsound mind."   The doctor answered:   "I think he was of unsound mind."   To another doctor was propounded the same, or a similar, question, the concluding part of which was:   "Would you expect to find in this defendant a healthy individual mentally, or one weak mentally and subject to epilepsy?"   The doctor answered:   "I would naturally expect one of weak mentality and weak nervous condition, and from that we could deduce the probability that he might be epileptic."   The state also

Appeal from Third District.

called a doctor, who was an expert in nervous and mental diseases, including epilepsy, and he, after considering the facts which the experts for the defendant had considered, and passed their opinions upon, expressed his opinion that the defendant, at the time indicated, was mentally responsible.

I refer to the foregoing only for the purpose of calling attention to the substance of the evidence respecting appellant's mental condition. While the jury found that his condition in that respect was not such as to affect his mental capacity to relieve him from responsibility, yet it may have been such as to affect his mental capacity to coolly deliberate and premeditate on his acts. The jury, therefore, as hereinafter suggested, should have been instructed to consider all of the foregoing evidence in determining appellant's mental capacity to deliberate and premeditate the homicide. While one's mental condition may not excuse the act, it may nevertheless affect the degree of guilt.

Massi, it appears, had left for parts unknown, and was not a witness at the trial. In addition to the testimony of the state's experts, already referred to, the state, on rebuttal, proved that during all of the time appellant was in jail, as before stated, he suffered no epileptic attacks, that he seemed normal, and was a model prisoner. The state also produced other evidence on rebuttal, and what is deemed material will be referred to hereafter in connection with the points decided.

Appellant's counsel have assigned 263 errors, all of which are relied on and are argued more or less fully in the twenty-three subdivisions of their brief, and part of which were supplemented by oral argument lasting nearly five hours. We shall, however, discuss only such assignments in this opinion as we deem material in view of the conclusions reached.

The first assignment relates to an alleged error committed by the trial court in refusing to grant appellant's motions for a continuance and change of place of trial. Appellant produced the affidavits of forty-three residents of Salt Lake County, among whom were lawyers, doctors and business men, who in effect deposed that, owing to the excited state of the public

mind in Salt Lake County then prevailing, which excitement affiants deposed was induced by reason of the fact that only a few days before the case was called for trial one Lopez, a fugitive from justice, had killed three deputy sheriffs and two others while they were attempting to arrest said fugitive for the crime of murder. The affiants, therefore, gave it as their conclusion that the appellant could not then have a fair and impartial hearing in said county. Upon the other hand, there were forty-eight residents of Salt Lake City, among whom were also lawyers, doctors and business men, who deposed that it was their belief that the appellant could and would be given a fair and impartial trial. We have frequently held (*State* v. *Haworth*, 24 Utah 398, 68 Pac. 155; *State* v. *Vacos*, 40 Utah 169, 120 Pac. 497; *State* v. *Riley*, 41 Utah 225, 126 Pac. 294, and cases there cited) that the granting or denying of motions for continuances and for change of place of trial upon the ground of excitement or bias, in the nature of things are, and must be, largely within the discretion of the trial court, and that we cannot interfere with the rulings of that court unless it is made to appear that the court has abused its discretion in that regard. While in view of some of the things that are made to appear in this record it would seem that the public mind must have been affected to a considerable extent, and for that reason we would have felt better satisfied had the court granted a continuance of the case for a reasonable time, yet in view of the whole record we cannot say that the court abused its discretion, and hence this assignment must fail.

It is next urged that the court erred in restricting appellant's counsel in his cross-examination of some of the state's witnesses. There is no merit to this contention. While courts are very loth to restrict cross-examination, and    3 especially so in capital cases, yet there is no reason whatever why the court should not confine the cross-examination within reasonable bounds. The court did not even do that in this case; but merely because the cross-examiner was not permitted to repeat over and over again questions upon subjects which he had already fully developed, he complains of having been unduly restricted. The court, without preju-

dice to his client's rights, might well have further restricted him in his cross-examination.

It is also insisted that the court committed error in permitting counsel for the state, over the objection of appellant, to propound and repeat improper and unfair questions to appellant's father, who testified as a witness on the former's behalf. Indeed, it is argued that the state's counsel was guilty of gross misconduct in that regard. It could subserve no useful purpose for us to repeat the questions propounded by counsel. It must suffice to say that, while we are not prepared to hold that the conduct of counsel was such as to affect the verdict of the jury, yet we are of the opinion that the propounding of the questions complained of bordered upon, if it did not amount to, misconduct. In the following cases conduct on the part of counsel similar in character to that complained of here is discussed and considered in all of its phases: *State* v. *Williams,* 65 N. C. 505; *Augusta, etc., Ry. Co.* v. *Randall,* 85 Ga. 297, 11 S. E. 706; *State* v. *Fischer,* 124 Mo. 460, 27 S. W. 1109; *Magoon* v. *Boston, etc., Ry. Co.,* 67 Vt. 177, 31 Atl. 156; *Schlotter* v. *State,* 127 Ind. 493, 27 N. E. 149; *People* v. *Ryan,* 108 Cal. 581, 41 Pac. 451; *People* v. *Mullings,* 83 Cal. 128, 23 Pac. 229, 17 Am. St. Rep. 223.

We suggest that counsel carefully read the foregoing cases, and as near as possible follow the rule there laid down with respect to their conduct in presenting argument to the jury or in propounding questions during the trial. Counsel in their zeal seldom appreciate the injury that may follow from certain conduct on their part occurring during the heat of a trial, and while their conduct should not be too strictly judged, yet they must not transcend the bounds of propriety, regardless of what they may think of the truthfulness or untruthfulness of statements of witnesses. In view that this judgment must be reversed and the cause remanded for a new trial for other reasons, we have deemed it best to refer to this matter in order to prevent the recurrence of the particular thing complained of, and not that it alone may or did affect the verdict, but had such a tendency.

It is further contended that the trial court erred in its

charge to the jury with regard to when an arrest by a peace officer is legal. Upon that subject the court charged the jury as follows:

"You are instructed that an arrest is made by an actual restraint of the person of the individual arrested, and that an arrest is lawful when made by a member of the police force of any city in either of the following cases:    **5, 6** (1) For a public offense, created either by city ordinance or by the statutes of the state, committed or attempted in the presence of the arresting officer; (2) When the person arrested has committed a felony, though not in the presence of the arresting officer; (3) when a felony has been in fact committed, and the arresting officer has reasonable cause for believing the person arrested to have committed it; (4) upon a charge made upon a reasonable cause of the commission of a felony by the party arrested."

In the instruction following the foregoing the jury were advised of the rights of a citizen "if an arrest   *   *   *   is unlawful." The jury were also informed of the rights of the officer "if the arrest is lawful." The court then defined what constitutes a felonious assault, and left the jury to determine for itself whether the arrest of appellant by the deceased on the morning of June 25th was "lawful" or "unlawful." To thus permit the jury to speculate upon whether the deceased had legal authority to make the arrest or not constitutes error. The decisions of the courts are practically unanimous that whether an officer was authorized to make an arrest, or whether the arrest was lawful or unlawful, when the facts are not in dispute, is a question of law for the court. Where, however, the facts are in dispute, and while the question on a given state of facts is still one of law, yet the jury must find the facts, and the court charge them in specific terms under what state of particular facts, when found, an arrest is lawful or otherwise. See *Creighton* v. *Commonwealth*, 83 Ky. 142, 4 Am. St. Rep. 143, and cases cited. It is there said:

"The defense had the undoubted right to show that the deceased, in attempting to arrest him, was acting without any authority; and that being a fact in issue, the court should have determined the

question and not the jury, as to the right of the deceased to make the arrest.''

See, also, *Diers* v. *Mallon*, 46 Neb. 121, 64 N. W. 722, 50 Am. St. Rep. 598, and *People* v. *Kilvington*, 104 Cal. 86, 37 Pac. 799, 43 Am. St. Rep. 73. Indeed, there is no substantial difference of opinion among the authorities upon this question. From the facts, as we have stated them, therefore, nothing is made to appear that appellant had in fact committed a felony, and it certainly does not appear that he committed either a felony or a misdemeanor in the presence of the deceased, or that he had been charged by any one of having committed a felony, as was the case in *People* v. *Kilvington*, *supra*, and in *Carson* v. *Dessau*, 142 N. Y. 445, 37 N. E. 493. It must be remembered that Massi, the only person who seems to have known just what act or acts appellant had committed before the deceased attempted to arrest the appellant, did not testify in the case, and hence what, if anything, he may have known or may have communicated to the deceased relative to appellant's acts or conduct preceding the arrest is not disclosed. It is conceded by counsel for the state that the evidence respecting the right of the deceased to arrest the appellant under our statute is purely inferential. Upon that subject all that is claimed is stated in the state's brief in the following words:

''It is true there was no affirmative proof that the fact of a quarrel between Massi and the defendant, or that during such quarrel the defendant had used a deadly weapon upon Massi, had been communicated to the officer, nor that a request had been made by Massi to the officer that he (the officer) arrest the defendant because of the fact that the defendant had, during such quarrel, used a deadly weapon upon him which he had concealed about his person, nor that the presence of the officer was for the purpose of arresting the defendant because of a violation of the city ordinance with reference to carrying concealed weapons, or because of the fact that an assault with a deadly weapon had been made upon Massi. Proof of these affirmative facts was unnecessary. The jury would have the right to infer such facts from the evidence introduced regarding the circumstances of the quar-

rel, the use of the razor by the defendant during such quarrel, the fact that Massi at the termination of the quarrel had attempted to use the telephone at the saloon for the purpose of calling an officer, the fact that immediately after the quarrel he left the saloon, and that a short time thereafter he returned in company with an officer—an officer having no personal acquaintance with the defendant, and who, upon approaching the defendant in the room, addressed him and made inquiry regarding the nature of the trouble. All these facts lead to the reasonable conclusion that the officer had been informed by Massi of what had occurred, and had been requested to arrest the defendant, both because of the fact of the assault upon him with a deadly weapon, and because of the further fact that the defendant then had such a deadly weapon concealed about his person. Such conclusions might properly be made by the jury from the facts then in evidence. It was within the right of the state to show the facts in the case, one of which was the ordinance in question. It was the province of the jury from these facts, together with any reasonable inference to be drawn therefrom, to conclude whether a public offense had been committed in the presence of the officer, or whether such officer had reasonable cause before making the arrest of the defendant to believe that he had committed a crime, or whether both of these conditions existed.''

It is not deemed necessary, and I shall not attempt to enlarge upon the reasons why counsel's claims are entirely too sweeping, except to say that the jury had no right to assume or infer what particular thing or fact Massi communicated to the deceased respecting appellant's conduct. If such an assumption can prevail, then it never would be necessary to prove authority, since it could always be inferred that the officer, must have been informed that a felony had been committed and that the accused in all probability committed it. There was no evidence to show that appellant had in fact committed a felony, nor that the deceased had reasonable cause to believe that appellant had committed it, if in fact he had committed one. All this was left to conjecture pure and simple. The state, therefore, utterly failed to prove any

fact or facts from which the court could say, or the jury could have found under proper instructions, that the deceased was authorized to arrest the appellant. The case, therefore, is one of failure of proof upon that subject, and hence the court should have charged the jury that here was no evidence respecting the officer's right or authority to arrest the appellant. The case must therefore be treated as though the deceased had committed a technical trespass in attempting to arrest appellant. Nor does the city ordinance prohibiting the carrying of concealed weapons, introduced in evidence, help the matter. Nothing is shown that the deceased attempted to arrest the appellant for carrying concealed weapons, or that the deceased even knew or had cause to suspect that appellant had a revolver in his possession. Indeed, it would seem that the deceased neither knew nor suspected such to be the fact, else he would have taken the revolver from appellant before attempting to take him to the police station.

In case a homicide has been committed, then in making, or in attempting to make, an arrest, the question of the authority of the officer or person making, or attempting, the particular arrest is always important upon the question of the degree of guilt of the accused. Where, therefore, an officer is killed in making an arrest, who it is claimed was without authority to make it, the jury, from all the facts and circumstances disclosed by the evidence, must determine whether, by reason of the making, or attempting to make, the arrest in the manner and under the circumstances it was made, or attempted, the killing constituted murder in any of its degrees, or merely constituted manslaughter, or whether it was justified in law. In the case at bar I think the question of appellant's right to resist the arrest in question was properly and fairly submitted to the jury by the trial court. Although an officer or other person may make, or attempt to make, an arrest without legal authority so to do, yet the person arrested may not, for that reason alone, kill the person or officer making or attempting to make an illegal arrest. Such a homicide may still be murder in the first degree, if the facts and circumstances under which it occurred bring it within the statutory definition of first degree murder. It

certainly is not the law—and we trust never will be in this jurisdiction—that a citizen may kill an officer with impunity merely because such officer may make an attempt to arrest the citizen without legal authority so to do. True, the right of the citizen to enjoy liberty at all times is sacred, and may not be interfered with without legal right or authority by any one. Yet, upon the other hand, the citizen may not ruthlessly take the life of any one who may interfere or attempt to interfere with that liberty. Where an unlawful arrest is attempted by an officer or another, the person sought to be thus unlawfully arrested may no doubt resist such an arrest with all proper and reasonable means. He may, however, not kill the offending officer or person, unless it reasonably appears to such citizen that his life or limb is in danger. In other words, life may not be sacrificed in such cases, unless it is done pursuant to the right of self-defense, the same as in other cases of personal trespass. 1 Bishop, Cr. L., Section 868; *State* v. *Byrd,* 72 S. C. 104, 51 S. E. 542; *State* v. *Meyers,* 57 Or. 50, 110 Pac. 407, 33 L. R. A. (N. S.) 143; *People* v. *Price,* 9 Cal. App. 219, 98 Pac. 547; *Roberson* v. *State,* 43 Fla. 156, 29 South. 535, 52 L. R. A. 751; *Creighton* v. *Commonwealth, supra;* *Williams* v. *State,* 44 Ala. 41. The Supreme Court of Alabama, in stating the respective rights of the citizen and the officer where an illegal attempt to arrest such citizen is made, in the last case cited, says:

"The citizen may resist an attempt to arrest him, which is simply illegal, to a limited extent, not involving any serious injury to the officer. He may oppose a felonious aggression upon him in the execution of a lawful arrest, even to slaying the officer, when it cannot otherwise be prevented. But where he has no reasonable cause to apprehend any worse treatment than a legal arrest should subject him to, it is his duty to submit and seek redress from the law."

In the case of *State* v. *Meyers, supra,* the Supreme Court of Oregon states the rule thus:

"Where the arrest is made by a known officer, and nothing is to be reasonably apprehended beyond a mere temporary detention in jail, resistance cannot be carried to the extent of taking life."

As we have pointed out, there is nothing shown in this case

from which the jury would have been justified in finding that appellant had any reasonable cause to believe that the deceased in any way threatened his life or physical safety in making the arrest in the cafe, and whether he had any reasonable cause to believe or apprehend any bodily harm, great or otherwise, at the hands of the officer or Massi when the rearrest was attempted, as we shall see hereafter, was fully and properly submitted to the jury. The appellant had a clear remedy if his arrest was in fact illegal, and he should have pursued that rather than the one selected by him.

The question, therefore, is: Was the case properly submitted to the jury upon the facts? This brings us to the assignment that the court committed error in its **8, 9** charge to the jury. The court, in submitting the question of first degree murder to the jury, gave the following charge:

"Premeditated means thought of beforehand, for any length of time, however short. There need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as the successive thoughts of the mind. It means a specific intention to take human life, thought of beforehand. If there is such design, or determination to kill, deliberately formed in the mind at any moment before the fatal act is done, it is sufficient."

This is all the information the court gave the jury respecting premeditation. The court did, however, as we think, correctly define deliberation. Our statute (Comp. Laws 1907, Section 4161), so far as material here, provides:

"Every * * * willful, deliberate, malicious, and premeditated killing, * * * or (any killing) perpetrated by any act greatly dangerous to the lives of others and evidencing a depraved mind, regardless of human life—is murder in the first degree."

Under our statute, therefore, it is not sufficient that the killing of a human being be intentional and deliberate, but to constitute murder in the first degree, in addition to the foregoing, the killing must be premeditated. The charge of the court that an act can be premeditated within a space of time so brief that the human mind cannot appreciate it—

that is, cannot grasp it—seems confusing, to say the least. It is true that quite a number of courts have approved such expressions in instructions in particular cases under statutes similar to ours. See 3 Thompson on Trials (2d Ed.), Sections 5437 to 5446, inclusive, where instructions approved by various courts are given. Such expressions are also found in the instructions given in the following cases: *State* v. *Prolow*, 98 Minn. 459, 108 N. W. 873; *Miller* v. *State*, 54 Ala. 155; *People* v. *Suesser*, 142 Cal. 354, 75 Pac. 1093; *State* v. *McDaniel*, 94 Mo. 301, 7 S. W. 634; *Koerner* v. *State*, 98 Ind. 8; *Perugi* v. *State*, 104 Wis. 230, 80 N. W. 593, 76 Am. St. Rep. 865; *Binns* v. *State*, 66 Ind. 428; *People* v. *Callaghan*, 4 Utah 56, 6 Pac. 49. The Minnesota statute, however, differs from ours. In *Binns* v. *State, supra,* the accused had been convicted of first degree murder four different times, and it was manifest that the jury could not possibly have been misled or affected by the charge given. The charge here in question has, however, also been given in at least one other case which came before this court, namely, in the case of *State* v. *Dewey,* 41 Utah 538, 127 Pac. 275. No objection was, however, made to the charge in such particular, nor was the point in any manner presented or called to the attention of the court in that case. The judgment was reversed on other grounds. In the case of *People* v. *Callaghan, supra,* the accused was convicted of second degree murder only, and the court, in passing upon such an expression in the charge said:

"In this case, the appellant was acquitted of murder in the first degree, and, as applied to murder in the second degree, the offense of which he was convicted, the instruction was correct."

It is true that the justice, in writing the opinion in that case, in other portions of his opinion seems to approve such an expression; but it requires no argument to show that what he said otherwise, in view of the conclusion reached in that case, could have no bearing upon the real question before us. While we cannot pause to review all of the cases in which such expressions have both expressly and impliedly been approved by appellate courts, yet we do not hesitate to say that a careful reading of those cases will, in almost every

instance, convince the reader that the cases were correctly decided, and that by reason of the facts and circumstances involved in them the jury could not have been affected, much less misled, by the expressions used by the trial courts in their charges. Moreover, the definition of premeditation in almost every one of those cases is such that, notwithstanding the expression that "no appreciable time is necessary," it is nevertheless clearly made to appear from what is said that by the expression "no appreciable time" was in fact meant that no fixed or definite time for premeditation was necessary. That no fixed or definite time is necessary or can be stated to the jury is manifestly sound, and is supported by practically all the courts.

In the following cases, however, such expressions are criticised and disapproved: *Ross* v. *State*, 8 Wyo. 384, 57 Pac. 931; *State* v. *Rutten*, 13 Wash. 203, 43 Pac. 30; *State* v. *Moody*, 18 Wash. 165, 51 Pac. 356; *State* v. *Greenleaf*, 71 N. H. 606, 54 Atl. 38; *State* v. *Hockett*, 70 Iowa 442, 30 N. W. 742. In 1 Wharton's Cr. Law (11th Ed.), Section 219, speaking of the deliberation and premeditation necessary to constitute murder in the first degree under a statute like ours, the author says:

"Deliberation and premeditation being established, the length of time it existed is immaterial; the homicide will be murder. Design long enough for reflection preceding the killing, and being of sufficient duration for the formation of a definite purpose to kill, may constitute a 'deliberate and premeditated design to kill.' A fixed design to kill makes the homicide murder in the first degree; *a design to kill formed on the spur of the moment* makes the homicide murder in the second degree." (Italics ours.)

To the same effect is *People* v. *Chiaro*, 200 N. Y. 318, 93 N. E. 931. In *People* v. *Majone*, 91 N. Y. 212, Mr. Justice Earl states the law under a statute like ours thus:

"Under the statute, there must be not only an intention to kill, but there must also be a deliberate and premeditated design to kill, Such design must precede the killing by some appreciable space of time. But the time need not be long. It must be sufficient for some reflection and consideration upon the matter, for choice to kill or not to kill, and for the formation of a definite purpose to kill. And when the time is sufficient for this, it matters not how brief it is.

The human mind acts with celerity which it is sometimes impossible to measure, and whether a deliberate and premeditated design to kill was formed must be determined from all the circumstances of the case."

In our judgment the correct doctrine is contained in the foregoing quotation. No attempt should be made to fix any definite space of time which is necessary to constitute the premeditation required by our statute. Why, then, confuse the jurors, who are laymen, with statements which must be utterly incomprehensible to them? Why tell them that an act, which constitutes the most heinous crime known to the law, and which involves the most momentous consequences to both the slayer and his victim, can be conceived and premeditated (reflected upon) within a space of time so brief that the human mind can neither appreciate nor grasp its duration? And why, after telling them that, attempt to explain it away by again telling them that the statement does not mean just what the words imply? Why not inform the jurors in plain and explicit terms just what the law requires? Why not tell them that, while it is not necessary that there be any definite or fixed period of time for premeditation or reflection, and that no fixed or definite time can be stated, yet that some space of time, however brief, for premeditation, is necessary before the fatal shot is fired or the fatal blow is struck, and that if they find that there was a fixed design or purpose in the mind of the accused to kill for any space of time, however, brief, before he committed the fatal act, and that he committed the same pursuant to such design or purpose, then the killing would constitute murder in the first degree? The jury should also be informed in that connection that in determining the question of such design and premeditation they should take into consideration all the facts and circumstances developed at the trial, as well as the evidence relating to the mental condition, including that of intoxication of the accused, where such evidence has been introduced and is proper to be considered by the jury, as hereinafter stated.

Moreover, as has been frequently suggested, some men think and act more quickly than others. Again, the same man may think and act differently under different circumstances, and

when the mind is or recently has been afflicted with disease, drugs or intoxicants it may act more sluggishly. All these things may, and usually do, have more or less influence upon men's actions. While, therefore, we are not prepared to say that we should, under all circumstances, reverse a judgment because the court has charged the jury with regard to premeditation, as was done in this case, yet we do hold that under the evidence in this case relating to appellant's physical ailments and the effect such ailments may have had on his mental condition the charge, in the form it was given, may have influenced, and in all probability did influence, the jury either to find the defendant guilty of murder in the first degree, or at least in inducing them to withhold the statutory recommendation. While it is true that the jurors were not required to believe the evidence with regard to appellant's mental condition, yet it is also true that they may have concluded that no appreciable time—that is, no time whatever—for premeditation was necessary, regardless of what that mental condition may have been, so long as they found that appellant was not insane to the extent of being morally irresponsible for his acts. That, as a matter of course, is not the law. A person's mental condition may not be such as to make him irresponsible for his acts, and yet it may be such as to relieve him from the extreme penalty imposed by law for the committed act. This is the theory upon which our statute giving the jury the right of recommendation is based, and, as we held in *State* v. *Thorne,* 39 Utah, 208, 117 Pac. 58, one accused of and tried for murder in the first degree is always entitled to the uninfluenced judgment of a fair and impartial jury upon that question. If, therefore, a person who is both mentally and physically sound is entitled to the judgment of a jury whose minds are uninfluenced from any source, how much more important is it that one whose physical ailments and mental condition incident thereto are by competent evidence shown to be abnormal, to say the least, should be tried by a jury upon such instructions as leave no reasonable room for doubt with regard to what the charge really means upon a subject so important as the one just discussed? Under the particular circumstances of this case, as

disclosed by the evidence, therefore, we think the giving of that portion of the charge we have set forth herein constituted reversible error.

The next assignment is closely related to, and must be considered in connection with, the one just discussed, for the reason that it relates to appellant's mental condition at the time the shooting occurred. As pointed out, appellant's contention is that at the time the shooting occurred, he was intoxicated, and, in view of his physical ailments, alcoholic liquors had a peculiar effect upon his mind. The court charged the jury as follows:

"You are instructed that no act committed by a person while in a state of voluntary intoxication is less criminal by reason of his having been in such condition; but whenever the actual existence of any particular purpose, motive, or intent is a necessary element to commit any particular species or degree of crime, the jury may take into consideration the fact that the accused was intoxicated at the time, in determining the purpose, motive, or intent with which he committed the act."

That instruction, after the first four words, is an exact copy of Comp. Laws 1907, Section 4070, and thus states the law of this state upon the subject of intoxication. As an abstract statement of the law it is therefore correct. Appellant's counsel, however, contend that the instruction in its present form was no guide or aid to the jury, and hence the case was, in effect, submitted to them as though no instruction had been given upon the subject of intoxication. Counsel further contend that they offered a proper request upon the subject, and that the court erred in refusing to charge as requested. We are of the opinion that, in view of the evidence of appellant's mental condition, including that relating to his intoxication, and especially in view that the court's attention was directly called to the question by appellant's request to charge, it, in substance at least, should have charged the jury as requested; that is, the court, in effect, should have charged the jury that, while voluntary intoxication was neither an excuse nor a defense, yet, if the jury found that appellant was intoxicated to such an extent that he was mentally incapable of

deliberating or premeditating, and to entertain malice afore-though, and to form a specific intent to take the life of the deceased, in such event the jury should not find him guilty of murder in the first degree. In this case such a charge was very important, in view of the whole evidence relating to ap-pellant's affliction, which, if the evidence is true, did neces-sarily more or less affect his mind. And of course the court could not assume, in charging the jury, that the evidence upon that or any other subject was either true or false. Merely to charge the jury in the language of the statute was not sufficient in this case, and it may well be doubted whether it is sufficient in any case where a charge with regard to in-toxication is proper. As directly bearing upon this point, see 17 A. & E. Ency. Law (2d Ed.), 408, 409; 21 Cyc. 1047; *Cook* v. *State*, 46 Fla. 20, 35 South. 665; *People.* v. *Leonardi*, 143 N. Y. 360, 38 N. E. 372; *People* v. *Corey*, 148 N. Y. 476, 42 N. E. 1066. In the cases cited this precise question is con-sidered, and instructions like the one in this case are criticised. It is further held in those cases that in cases where, as here, the crime is divided into degrees, and where deliberation and premeditation are necessary elements, the jury should be prop-erly instructed with respect to the effect of intoxication. The jury should thus be told in plain terms that while voluntary intoxication cannot be considered, either as a defense or an excuse for the act charged, yet if they find that the intoxica-tion was to the degree and to the extent hereinbefore stated, such fact would be important in determining the degree, where the crime is divided into degrees. They should also be told that, if they find the intoxication did not affect the mind of the accused to the extent stated, then not to consider the same. The law in this regard is humane, and seeks to temper the penalty or punishment to the moral responsibility involved in the act.

Some time after the homocide the room occupied by the ap-pellant and his father was searched. There was found therein a revolver, a black jack, two masks, and a pair of shoes called sneakers. These, when appellant was on the stand, were exhibited to him on his cross-examination. He said that the revolver belonged to his father, that the

black jack was left with appellant the week preceding the shooting by a certain Lugi Garza, a friend, who worked in Ogden, and that the shoes called sneakers he had purchased three or four days before the shooting from a certain dealer in Salt Lake City, who also testified to the purchase. Appellant further testified that he knew nothing concerning the masks. The reason why he bought the shoes he fully explained, and that in all probability he knew nothing about the masks was fully explained by another disinterested witness. Thereupon the state, over his objection, was permitted to introduce all of those articles in evidence; and it is insisted in the state's brief, and was an oral argument contended by the state's counsel, that inasmuch as appellant had voluntarily identified those articles and had explained the ownership thereof, no error was committed in admitting them in evidence. It is further contended that all of them were material and competent evidence upon the question of motive and in meeting appellant's evidence relating to his good character. We think they were improperly received in evidence. Clearly, under the circumstances disclosed by the evidence, those articles could shed no light upon appellant's motive in doing the shooting. A mere statement of the proposition, in the light of the evidence, it would seem, is sufficient answer to such a contention. How could the possession of such articles bear any relation to the motive which actuated appellant in shooting the deceased, who was a total stranger to appellant when he last saw the articles, if he ever saw all of them? He thus could not have obtained or possessed any one of the articles because he entertained any ill will against the deceased. Indeed, the proposition that the ownership or possession of those articles could not have had any possible relation to appellant's motive in shooting the deceased is so palpable that it admits of no discussion. Nor is the contention sound that the articles were admissible to meet and refute appellant's evidence relative to his good character. The only effect that the admission of those articles in evidence before the jury could have had was to convince them that appellant must be a bad man, or he would not have had them in the room he was occupying with his father. Nor does it

require argument to condemn such procedure in our jurisprudence. If any one contended for the proposition that, in order to show that one accused of a particular crime was probably guilty of some other offense, or to establish his guilt it was proper to show that he was a bad man generally, or that he had the inclination to commit or the means of committing other offenses, his contention would fall on deaf ears. In principle wherein does the contention here made differ from the supposed one? It is settled law that evidence of good character, or evidence to the contrary, must be confined to the general reputation of the person, or to the general reputation of the particular trait of character in issue. That question was settled in this jurisdiction in the case of *Harrison* v. *Harker,* 44 Utah, 541, 142 Pac. 716. The rule is there stated in the headnote in the following words:

"Where the character of a party is in issue, it is only the general reputation that may be assailed, which cannot be done by proof of particular acts of wrongdoing."

If particular acts of actual wrongdoing may not be shown, how can the fact that a person possesses the means or the inclination to commit wrongs be shown? In the following cases the question as to what is proper evidence respecting good character is thoroughly considered, and in all of them the rule as quoted from *Harrison* v. *Harker, supra,* is not only upheld, but it is strictly enforced; *State* v. *Sterrett,* 71 Iowa 386, 32 N. W. 387, approving and following *Gordon* v. *State,* 3 Iowa 410; *People* v. *Bishop,* 81 Cal. 113, 22 Pac. 477; *Bayse* v. *State,* 45 Neb. 261, 63 N. W. 818; *Nelson* v. *State,* 32 Fla. 244, 13 South. 361; *Cook* v. *State,* 46 Fla. 20, 35 South. 665; McKelvey on Ev. (2d Ed.), 123. The only difference among the courts goes to the extent that the witness who testifies to the good character of the accused and the accused himself may be cross-examined. In Iowa and California cross-examination is very much restricted in that regard, while in most other jurisdictions a more liberal cross-examination is permitted. But the articles are inadmissible for other reasons which are clearly stated by the Supreme Court of California

in the case of *People* v. *Lee Dick Lung,* 129 Cal. 491, 62 Pac. 71. That court makes it quite clear that such articles under the circumstances of the case at bar are not admissible for any purpose.

None of the cases relied on by the state are in point upon the proposition involved here. Neither do the recent cases emanating from this court (*State* v. *Riley, supra,* and other cases), in which the admission in evidence of certain articles found in the possession of the accused was sustained, have any bearing upon this question. The question, when stripped of all extraneous claims, simply amounts to this: May articles such as disclosed under the circumstances of this record be put in evidence to show criminal propensities, or motive, or bad character? Such a procedure would hardly be tolerated even in continental Europe, and it certainly finds no support in English or American jurisprudence. Moreover, the articles found are not necessarily the implements or instrumentalities of a confirmed criminal. Certainly many men have revolvers in their homes, and no one would think of accusing them of being bad men for that reason. Again, masks may be found in some homes, especially among young people; but, so far as we know, they are not so clearly the indicia of crime that they can be received in evidence as proof of that fact. Again, many different kinds of shoes may be and are no doubt used by different people. No doubt some good men wear garments similar to those worn by the criminally inclined, but to do so is no crime, nor is it necessarily evidence of a criminal propensity. A black jack no doubt is a dangerous implement in the hands of a criminal, and is perhaps generally used by criminals. But merely to find such an implement in the home of an individual after a homicide has been committed by him is no evidence whatever that he had murder in his heart when he committed the same.

While the homicide committed by the appellant seems quite unjustifiable, and while perhaps he deserves severe punishment, yet no one should, and we hope in this jurisdiction none will, ever suffer the extreme penalty of forfeiting his life until he has been legally convicted. In the eyes of the law

no one, however humble, is deemed guilty until he is found so in conformity to law.

The matters hereinbefore considered are not technical, but are substantial. They all directly affect the legal rights of every one. Under our jurisprudence men may be tried only for the specific crime with which they stand charged. All other crimes, with well known exceptions, which the accused may have committed or contemplated, are irrelevant, and may not be shown against him. If other actual offenses may not be shown, then it must follow that facts and circumstances from which some might deduce an inference that those who have offended might possibly be induced to commit more offenses can likewise not be shown. The court committed manifest error in admitting in evidence the articles referred to.

It is further insisted that the court erred in its charge respecting the effect that the jury should give to the evidence of good character. While the charge is not a model, yet we do not think the appellant was prejudiced in any substantial right by what the court said or omitted to say in that regard. We remark, however, that the question of the sufficiency of such a charge and the effect that the jury may give such evidence is so fully stated in *State* v. *Brown,* 39 Utah 140, 115 Pac. 994, Ann. Cas. 1913E, 1, that it seems wholly unnecessary to discuss this subject further.

Since writing the foregoing, one of my Associates, in a separate opinion, has expressed much doubt whether what I have said upon the question of premeditation states the law, and whether it will not confuse, rather than aid, the trial courts in charging the jury upon that subject. The mere suggestion shows that the writer of that opinion regards the question of time as one of law rather than one of fact. The vice of such a charge consists in attempting to fix or limit the time which is deemed necessary for reflection or deliberation, or which is sufficient for that purpose. I repeat here, what I have already in effect said, that the courts should not attempt to fix or prescribe any time, but should submit the question of whether the killing in question was committed with premeditation and deliberation to the jury, and if they, under all the facts and circumstances relating to the killing,

including the evidence respecting the mental condition of the accused at the time if there be such, find beyond a reasonable doubt that the killing was in fact premeditated by the accused, then the statute defining that element has been met, and that question should be found against the accused. Is it not easier to submit a proposition without a specific limitation as to time than it is to attempt a limitation in that regard, and especially where the law fixes and can prescribe no limitation?

While we are upon this subject it might not be out of place to again refer to what we have several times before referred to, namely, that in charging the jury the trial courts should avoid as much as possible the statement of mere abstract rules or principles of law. See the recent case of *Smith* v. *Cannady*, 45 Utah 521, 147 Pac. 210. Jurors are all laymen, and possess no knowledge of legal rules or principles. To merely inform them with regard to the abstract propositions of law, however correct such a statement may be, nevertheless affords them no guide as to how to arrive at a correct conclusion. As a rule jurors possess the requisite intelligence and knowledge to arrive at a correct conclusion with regard to the facts, but in most instances they are entirely unable to apply the law to the facts after they have found them. Whenever such a course is possible, the jury should be told in direct terms that, if they find the facts upon a certain issue or question to be a certain way, the law requires the result to be a certain way, stating what it should be. Whenever the facts are found, the law determines the result, and the theory of our procedure is that the jury shall be untrammeled in determining the ultimate facts, while the courts must direct the result required by the law when the ultimate facts are found or are conceded. Why, then, attempt to direct the jury in arriving at the correct result by merely stating to them abstract principles of law, which the court has determined in its own mind are applicable to the issues in case the ultimate facts are found to be either one way or the opposite? Is it not far better to tell the jury that, if they find the ultimate facts respecting the issue or the question involved to be one way, then the law requires that the result—that is, their verdict or conclusion upon that issue or

question—must be a certain way, stating in terms what it should be? The jury thus always finds the facts, while the court in direct terms informs them what the law, upon those facts, requires, and further tells them what the result should be, which, if it covers the whole case, constitutes their verdict. While it is true that by following the abstract method of charging the jury they may, and no doubt often do, arrive at a correct result, yet they also often in effect apply their own conception of the law to the facts, and thus do not arrive at the result the law requires, although the party against whom the issues are declared may not be able, for reasons known to every lawyer, to have the result reversed or modified on appeal.

The case at bar affords a striking illustration of how a mere statement of abstract rules of principles may be useless to a jury of laymen. Referring again to the instruction upon intoxication as given in this case, it is at once apparent to the lawyer that a jury of laymen may read such a charge over and over again and yet receive no light whatever how to apply it to the facts which were produced before them upon that subject. If the jury, however, were told that if, from all the evidence upon that subject, they found that the accused was intoxicated to the extent that he was mentally incapable of deliberating and premeditating the killing, he in such event could not, under our law, be guilty of the crime of murder in the first degree, and they should so find, but if, upon the other hand, they found beyond a reasonable doubt that, although he was intoxicated, yet that such intoxication did not affect his mental capacity to deliberate and premeditate, or that he had sufficient mental capacity to premeditate and deliberate, and that he did in fact deliberate and premeditate the killing in question, then, if they found all the other essential elements constituting the charge against the accused beyond a reasonable doubt, he would be guilty of murder in the first degree, and they should so find, the jury could not possibly go astray. Of course, in criminal cases the court must define all techincal words and phrases, which is usually done, and in addition to that the court usually also tells the jury just what the material elements constituting the charge are. After doing so, the court could dispose of most questions by

simply directing the jury in plain terms what the result should be in case they find the facts upon any issue or question as indicated by the court. The principle now under consideration is discussed at some length in *Shepard* v. *Railroad Co.*, 41 Utah, 469, 126 Pac. 692.

After a careful consideration of all the other numerous assignments, we find nothing worthy of further discussion.

For the reasons stated, the judgment is reversed, and the cause remanded to the district 'court of Salt Lake County, with directions to grant the appellant a new trial.

STRAUP, C. J.

I concur. I, too, think the attempted arrest of the defendant by the deceased was unlawful. It is not claimed that any breach or violation was committed in the presence of the officer. The attempted arrest admittedly was without a charge, or warrant, or process of any kind, or without even informing the defendant for what he was being arrested. It is claimed that the defendant had committed a felony—made an unlawful assault in the saloon on Massi with a deadly weapon, a razor—and for that reason the officer was justified in arresting him without a charge, or warrant, or process. The court, in the language of the statute (Comp. Laws 1907, Section 4637), charged the circumstances under which a lawful arrest for a felony committed, not in the presence of the arresting officer, may be made without a warrant, and that such an arrest is lawful "when the person arrested has committed a felony," or "when a felony has in fact been committed and he (the officer) has reasonable cause for believing the person arrested to have committed it." Under such a statute, to constitute a lawful arrest in the daytime, without a warrant, for an offense not committed in the presence of the officer, it is enough that the officer had reasonable cause to believe the person arrested had committed a felony, but it must appear that "a felony has in fact been committed," and that the person arrested committed it, or that the officer had reasonable cause to believe he had committed. That is the statute. That must control us, no matter what may be the rule elsewhere, or what it may have been at common law.

Thus must we look to the evidence to ascertain what, if any, felony had been committed. As to that but two witnesses testified, the defendant in his own behalf, and one Fina, a bartender, in behalf of the State. As testified to by the defendant, he in the morning, between eight and nine o'clock, met Massi near or at a saloon. They drank and played cards. The defendant accused Massi of cheating. A dispute and a quarrel arose. The defendant "was sick and half drunk." Massi was much larger and stronger than he was. He further testified that, in the quarrel, Massi pushed him about, and— "after he pushed me hard I fell down, and he came on top of me. Then he started to hit me with his hand. After that he took an empty bottle. He held me with one hand. I was between a few barrels or cases of beer, and when I saw him try to hit me with the bottle I put my hand in my pocket to pick out the razor, but it fell down on the floor, and after a half minute I got the razor and opened it. I noticed that it cut my hand a little. I used it in my defense, but I don't know whether it cut Pete (Massi) or not. He had his knees at that time on top of my breast, and in one hand he had the bottle, and with the other he held my left hand. I also noticed he had a gun in his side pocket, and I believed from what he was doing that I was in danger of great bodily harm, or of my life. At that time Camile Brunzo came in, and they (Brunzo and Fina) separated us. I do not know what became of the razor. Pete Massi then started calling me bad names. Charlie Fina said, 'Make up, boys, and shake hands.' I tried to shake hands with Massi, but he would not shake hands with me. I remember we drank after that. When he refused to shake hands, he said: 'No, I won't shake hands. I am going to kill you. Remember this is the last day of your life. I want to meet you somewhere this evening.' "

He further testified to Massi's calling him vile names, making threats that he would be looking for him that evening and would kill him. The defendant, with Brunzo, then left the saloon. Massi also left the saloon.

Fina, the state's witness, testified that the defendant and Massi were in the front of the saloon playing cards and quarreled over the game, and that there was a sort of partition

between the rear of the saloon and the bar. He further tes-
tified:

"The first thing I noticed they were scuffling, and then they
passed beyond the partition in to the back room. The next
I saw, Johnnie (the defendant) was on the floor and Pete
Massi over him. I would not say that Pete did not have a
bottle or an ax in his hand. I could only see the part that
faced me. I could not see anything in his hands. It was
several seconds after they passed behind the partition before
I got to the end of the bar to see them, and what was being
done in there during that period I don't know. Whether Massi
had knocked the defendant down with a bottle or something
else I could not say, but when I saw them Massi had Johnnie
down, holding him, and I made him get off; that is, I asked
him to, and said there would be no fighting done here. I don't
know whether Brunzo came in at that moment or not. If he
was there, I didn't see him; but lots of people come in that I
don't notice. * * * I could see Massi's back when I got to
the end of the bar, and Massi was stooping over the defendant
in a position of this (indicating) kind. Massi was holding
defendant down. Did not see any blows struck. When I ob-
served Massi, his hands were not moving. When I got to the
end of the bar, I told them to 'cut that out,' and that if they
were going to quarrel they could go outside. They got up and
came in front of the bar, and the defendant called Massi and
said, 'Let's have a drink,' and laid down a silver dollar, and
invited me to drink. We all drank. Massi said, 'I am cut on
the shoulder.' He took back his shirt, and there was a little
bit of a wound, merely brought blood. It mad him mad, and
he wanted to use my telephone. I told him he could not use
the telephone to call officers. After the drink they went out.''

Now, I do not think that shows that the defendant made an
unlawful assault on Massi. It shows that whatever he did was
done with cause and justifiably. To hold otherwise is to say
that the defendant, a weakling and an epileptic, in a half-
drunken condition, and on the floor with Massi on top of or
over him in a threatening attitude, was required to submit
to whatever ·chastisement or punishment Massi saw fit to ad-
minister to him. That Massi may have received a slight cut

on the shoulder from the razor in the hands of the defendant is not the determinative factor. The controlling thing is the circumstances under which the cut was received. They show, substantially without dispute, that what the defendant did was not unlawful or felonious, but justifiable. I therefore see nothing to show that the defendant had committed a felony.

After that trouble the defendant went to a nearby restaurant. He remained there but a short time, and then went up town and purchased a gun, he says, to protect himself because of the threats made by Massi. In about an hour and a half he returned to the restaurant and seated himself on a box in a back room. He had been there about 15 minutes, "doing nothing and not saying anything to any one," when Massi "put his head into the room," saw the defendant, and then departed. In a few minutes he returned with the deceased, a police officer. No attempt was made to arrest the defendant for having a weapon. So far as made to appear, neither the officer nor Massi knew that the defendant had a gun. Neither was any attempt made to arrest the defendant for drunkenness. What took place when the officer and Massi came to the restaurant is told by the State's witnesses. The officer, walking towards the defendant, asked him, "What is the trouble?" The defendant replied, "There is no trouble." At that Massi threw his coat back and said, "This is the trouble," exhibiting, as one of the witnesses called it, "a scratch or something on the shoulder;" another, a tear in the shirt. The officer then walked up to the defendant, "grabbed him by the shoulder," and commanded him to go with him. The defendant said, "Let me explain." The officer said, "You can't explain; there will be no explanation here." The officer then "marched the defendant in front of him, and had hold of him, and went out of the building and up the sidewalk," Massi following. When they reached "an alarm box," and as the officer was about to turn in an alarm, the defendant ran away. The officer and Massi pursued him but a short distance when the officer, who had overtaken him, and was about to reseize and recapture him, was shot by the defendant. One witness for the state testified that as the officer overtook the defendant he called out "Hands up!" and raised his club in a

striking attitude, and that the defendant then shot. Other witnesses, seeing the defendant run and pursued by the officer and Massi, testified they did not see a club raised, but testified that for a time the defendant and the officer were not in view, but that they saw them when the last shot was fired, and saw the officer stagger and fall. It is not made to appear that the officer undertook to draw his gun, or threatened to shoot the defendant. The most that can be claimed is that he, in the attempt to reseize and retake the defendant, commanded him to throw up his hands, and raised his club in a striking attitude, when the defendant shot him.

On these facts the court permitted the jury to say whether the arrest at the cafe, or the attempted arrest at the time of the homicide, was lawful or unlawful. I concur with Mr. Justice FRICK that, as the facts concerning such arrest were without substantial dispute, the question was one of law for the court, and not of fact for the jury, and that the court ought to have charged that the arrest, or attempted arrest, was unlawful. The defendant thus was entitled to a charge as to his rights growing out of and relating to the unlawful arrest. That was important as bearing on the propositions of whether the killing was murder, or but manslaughter, or was justifiable. It undoubtedly is the law that when an officer, in attempting to make an arrest, abuses his authority, or uses unnecessary force and violence, the person so assaulted may, without retreating, repel force by force. Notes and cases, 4 Ann. Cas. 844. Though the arrest may be lawful, yet if the officer in making it should use excessive and unnecessary force to the extent of inflicting on the person arrested great bodily harm or endangering his life, the latter may repel that force by force, and may even slay the officer, if that reasonably appears to be necessary to save himself from such excessive and unnecessary harm or danger. What is the situation when the arrest is unlawful? The proposition is well stated in notes and cases, 33 L. R. A. (N. S.) 147:

"Whether the person whose right to liberty and freedom from illegal arrest is invaded is guilty of any offense when he kills the aggressor depends upon the circumstances of the case. He has no right to kill an officer who attempts to commit a trespass upon his

person, and nothing more; and the degree of force that he may use in resistance depends upon that used or attempted by the officer. Where a person resists an attempt to arrest him, made without legal authority, and the resistance is only proportionate to the assault, and is provoked by it, the killing, if without malice, is neither murder nor manslaughter."

Again:

"If the authority to make an arrest is wanting, the person attempting it is a trespasser, and the person arrested can resist, using such force only as is necessary to prevent the arrest."

That, as indicated, does not imply that one may resort to a deadly weapon and slay another for a mere attempt to commit an unlawful arrest or a trespass. But true it is one may resist an unlawful attempt to arrest him, and in doing that may use such force as is necessary to prevent the arrest. He, of course, may not slay his assailant, unless that is necessary to save himself from great bodily harm or imminent danger. So, if the wrongdoer, in attempting or making the arrest, resorts to force and violence to compel submission to such unlawful arrest, the person attempted to be arrested and whose rights are thus invaded may repel that force by force, using only so much as is necessary for that purpose; and if the wrongdoer resorts to such force and violence as to endanger the life of him thus attempted to be unlawfully arrested, or to do him great bodily harm, the latter may repel that force by force, even to the extent of slaying the wrongdoer, if that reasonably appears to be necessary to protect his life or to save himself from such imminent danger or harm. Notes to cases, *supra;* 66 L. R. A. 374, 375; 5 L. R. A. (N. S.) 1016; 2 A. & E. Ency. L. 852; 3 Cyc. 1048, and cases there noted. That I believe to be the weight of authority, and that in effect is what the court charged, in the event the jury found the arrest was unlawful.

No complaint is made of that, except that the court ought to have determined that the arrest was unlawful, instead of permitting the jury to determine whether it was lawful or unlawful. If, in case of an unlawful arrest, more force is used than is necessary to resist the arrest, and to prevent great bodily injury or harm, the killing of the arresting offi-

cer may be manslaughter or murder, depending upon the question of whether the killing was done in sudden passion provoked by the unlawful arrest, or whether it was done with malice. In many instances the killing of a person attempting an unlawful arrest is but manslaughter, because provoked by the unlawful arrest and done in sudden passion, and without malice. And that is the general rule, unless the evidence shows previous or express malice. Notes to cases, 66 L. R. A. 374; 8 L. R. A. 536.

Whether the case here was murder, or but manslaughter, or justifiable homicide, was, I think, a question of fact, requiring a submission of same to the jury, as was done. True, the evidence as to justifiable homicide is not strong. But, weak as it is, I think that question was properly submitted to the jury. The attempted arrest, as has been seen, was unlawful. The defendant offered to explain.. He was refused that. The officer unlawfully seized and attempted to take him in custody. The defendant, without offering any violence or force, ran away. He had a perfect right to do that. Without attempting to repel force by force, he fled. It is said he fled to prevent an arrest. Of course he did. But he fled from a wrongdoer, from one who had unlawfully seized him, fled to prevent further unlawful assaults on him and further invasions of his rights, fled to prevent an unlawful arrest. No crime or wrong was committed by the defendant in that. The officer and Massi, both armed, pursued him. They had no right to do that. There is some evidence that Massi, in the pursuit, reached for his gun. It is not shown that the officer reached for his gun, or threatened or attempted to shoot. But this much is clear: That the officer and Massi intended to use whatever force and violence was necessary to compel the defendant to submit to the unlawful arrest, even to the extent of inflicting on him great bodily injury, if that was necessary to compel him to submit; that is, they pursued him with the intent to forcibly recapture, reseize, and retake him, at all hazards. That they had no right to do. The fact that the deceased was a police officer made no difference. He, no more than a civilian, had the right to unlawfully pursue another and forcibly compel a submission to an unlawful arrest. So,

whether the defendant shot under a reasonable apprehension of imminent danger, or to save himself from great bodily harm, was, under the circumstances, and in the light of the evidence respecting his mental condition and state of mind, a question of fact, which was properly submitted to the jury. But, wholly independent of that defense, the unlawful arrest was also important as bearing on the questions of whether the killing was manslaughter, or murder, or first or second degree murder, all of which were also submitted to the jury.

I also concur with Mr. Justice FRICK that the charge as to premeditation and deliberation is erroneous. It is well recognized that to constitute first degree murder it is not enough to show an unlawful, intentional, and malicious killing. The elements also of premeditation and deliberation must be present. It is just as well understood that to premeditate means to think over, to revolve in the mind, beforehand; that to deliberate means to reflect, to consider, to weigh with a view to a choice or decision. That is what the words themselves imply. It also is true that neither length nor shortness of time between the intent and the act is the controlling factor of premeditation or deliberation. The time in a given case may be so long where the inference of premeditation or deliberation is most convincing. It may be so short where the absence of the inference is just as persuasive. The time may be more than ample for full meditation and most careful consideration, yet where the facts and circumstances may show the absence of premeditation or deliberation, or it may be so short as to be difficult of measurement in minutes or seconds, but where the facts and circumstances may, nevertheless, justify the inference of premeditation and deliberation. These things are so, not because there is any such rule or principle of law controlling them, or upon which they depend, but because of the facts and circumstances of the particular case. The law does not, nor in the very nature of things can it, fix a maximum or minimum time for premeditation or deliberation. That is something not depending upon or governed by any rule or principle of law, but upon and by the facts and circumstances of the case. It is the duty of the court to charge the jury the law applicable to the case,

and in that connection to charge what is meant by premeditation and deliberation, for these terms, in the law, have a well-defined meaning. But the court is not required, nor is it proper, to go beyond that, and also charge on principles of psychology, by telling the jury how quick or how slow the mind works under given circumstances, or how long or how short it may take one generally, or the accused, to premeditate or deliberate, or how long or how short a time is required to do that in a given case. True, the rapidity with which the mind at times may work is common knowledge; but it is not of that kind of common knowledge which the court in a given case may judicially notice and declare, either generally or specifically, as a rule of law or evidence, for that is something wholly within the province of the jury. The court defined premeditation to be "thought of beforehand; * * * a determination to kill deliberately formed." That is something requiring meditation beforehand; something considered and weighed; reflected on. Then the court destroyed it by charging that:

"There need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as the successive thoughts of the mind."

That is a space of time incomprehensible, and is characterizing two things, the intent and the act, about as instantaneous as the earth's rotation and revolution; two things at the same time, instantaneous. It is said such charges have been approved. Let that be so. Still a space of time between two things as instantaneous as successive thoughts is just as inconceivable now as it was before such decisions. What has or can be said by any judge, court, or philosopher of the law, to render it comprehensible? It seems incongruous to tell a jury that, before they can convict of first degree murder, they must find beyond a reasonable doubt that the killing was done with premeditation and deliberation, as those terms are defined and understood in the law, and then tell them that premeditation and deliberation may nevertheless exist, though the act follows the intent as instantaneous as successive thoughts. It is bad enough to tell a jury some incomprehensible thing, but still worse to tell them that is good enough on which to predi-

cate a finding of premeditation and deliberation. I think those courts which have taken the view that such a charge destroys the distinction between first and second degree murder are supported by the better reason. Especially do I think the charge here harmful because of the controlling questions in the case: The question as to whether the killing was done in sudden passion and under excitement provoked by an attempt of an unlawful arrest or whether it was done with malice, or with malice and premeditation and deliberation; and, as bearing on these, the question of the defendant's mental capacity and state of mind, due to epilepsy and intoxication.

I also concur with Mr. Justice FRICK on the other points discussed, and conclusions reached by him. Because of my concurring with him in holding that the question of whether the arrest was lawful or unlawful was, on the undisputed evidence, one of law, and that the court ought to have held that the arrest or attempted arrest was unlawful, and in holding that such question was material in determining whether the killing was manslaughter, or murder, either first or second degree, or was justifiable, and because of the views expressed by me on those subjects, I am, in Mr. Justice Mc-CARTY'S opinion, holding something not sustained by the authorities, and which, as he thinks, leads to "absurdities" and to most baleful consequences.

It is not controverted that, on undisputed evidence, the question of whether an arrest is lawful or unlawful is one of law and not of fact. So that is not what divides us. Nor is it disputed that by the statute it is provided that, when an offense is not committed in the presence of the officer, he may make a lawful arrest without a charge or warrant, "when a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it." In portions of his opinion, it seems, Mr. Justice McCARTY treats the matter that an arrest in the daytime, without a charge, or warrant, for an offense not committed in the presence of the offer, is lawful, if the officer has but reasonable cause to believe a felony has been committed, and reasonable cause to believe the person arrested to have committed it. At least such a conclusion seems justifiable from language used by

him in parts of his opinion. However that may be, the opinion of course, speaks for itself. I do not think the statute means that; and from what is said and decided in the prevailing opinion it necessarily follows that the same conclusion is there reached. In other portions of his opinion, Mr. Justice McCARTY, on the facts, takes a most decided stand that a felony had been committed by the defendant. As to that, both Mr. Justice FRICK and myself take the view that, on the record, there is nothing to show that a felony had been committed by the defendant. If we as to such view are wrong, and Mr. Justice McCARTY is right, then, of course, was the attempted arrest lawful, the charge permitting the jury to determine whether the arrest was lawful or unlawful not harmful to the defendant, and all that I, or Mr. Justice FRICK, said from the viewpoint that the arrest was unlawful, and as to the materiality of it is for naught. To support the conclusion that no felony had been committed by the defendant, I referred to the evidence bearing on that point. I think the evidence clearly supports the conclusion. Mr. Justice McCARTY is of different opinion. If I am wrong as to that, then is my premise wrong. If I am right, then is my premise right. And if my premise is right, and since admittedly the claimed offense for which the defendant was arrested or attempted to be arrested was not committed in the presence of the officer, and on charge made, or warrant issued, then, because of the statute, follows the conclusion that the arrest or attempted arrest was unlawful, unless (1) the statute means that an arrest is lawful if the officer has but reasonable cause to believe a felony has been committed, and (2) that the officer here making the arrest had reasonable cause to so believe. The first is not true because the statute does not admit of any such interpretation. If the first is not true, the second is not true. Though the first were not true, still the second is not here true, because there is no evidence to justify a finding that the officer had reasonable cause to believe a felony had been committed. All there is to support it is that Massi, in response to the officer's inquiry, "What's the trouble?" threw his coat back, saying, "This is the trouble," and exhibiting "a scratch on the shoul-

der,'' or a rent or tear in the shirt. That, as far as made to
appear, is all the knowledge the officer had as to the commis-
sion of a felony. What Massi, or another, or others, may else-
where have said to him concerning the encounter between
himself and the defendant in the saloon, where it is claimed
the felony was committed, is not disclosed.

Thus, on a review of the record, did I reach the conclusion,
concurring with Mr. Justice FRICK, that the arrest or at-
tempted arrest of the defendant at the cafe, and at the time
of the homicide, was unlawful, and that the court ought to
have so charged, and expressed views on the materiality or
importance of that question as bearing on the issues submitted
to the jury, including that of justifiable homicide, and more
especially as bearing on the question of whether the killing
was done in sudden passion and under impulses provoked
by the unlawful arrest or attemped arrest, or with malice,
or with malice and premeditation and deliberation. Saying
that, or pointing to evidence, slight though it may be, as tend-
ing to support the issues, or some of them, or attempting to
show the relevancy or materiality of some fact or factor in
evidence and as bearing on the issues, does not justify argu-
ments on improbability of facts, weight of evidence, or credi-
bility of witnesses, or ultimate conclusions as to the guilt
or innocence of the accused, nor justify conceptions of
supposed emergencies under which an officer may or may not
be justified in making an arrest. It is enough to know no
emergency is here shown, and enough to decide, on the facts
of this, and not on different facts of some other supposed,
case, whether the arrest here was lawful or unlawful, and,
if unlawful, what materiality that had. My conclusions of
course, may be carried to any logical extent thought proper.
If they do not stand the test, then must they fall. But the
validity of the syllogism should not be made to depend upon
disagreements of premises, or substitutions of conclusions for
major premises, nor upon the commercial geography of Salt
Lake, or its tourist trade.

A further point is made that the officer was justified in
arresting or attempting to arrest the defendant because the

defendant then had a gun, a deadly weapon, concealed on his person in violation of an ordinance, and hence committed, and then was committing, an offense—a misdeameanor—in the presence of the officer. There are two answers to that: First, it is most conclusively shown that the defendant was arrested, or attempted to be arrested, wholly because of the encounter between him and Massi in the saloon, and not for carrying a concealed weapon; and, second, that the officer had no knowledge that the defendant then had a gun on his person. Thus the officer's conduct in arresting or attempting to arrest the defendant cannot be justified on any such ground, for that was unknown to him, and not the cause, either directly or indirectly, of the arrest, and in no way induced or influenced the officer's conduct or actions in making or attempting to make the arrest. *Snead* v. *Bonnoil*, 166 N. Y. 325, 59 N. E. 899.

McCARTY, J. (concurring in part and dissenting in part).

I do not think the instructions complained of were prejudicial to the rights of the defendant. I am of the opinion, however, that some of the instructions assigned as error were much more favorable to defendant than the facts warranted. Especially is this so with regard to instructions Nos. 15 and 16, which should be read together and considered in connection with the facts on which they are predicated. These instructions are as follows:

"15. You are instructed that an arrest is made by an actual restraint of the individual arrested, and that an arrest is lawful when made by a member of the police force of any city, in either of the following cases: (1) For a public offense, created either by city ordinance or by the statutes of the state, committed or attempted in the presence of the arresting officer; (2) when the person arrested has committed a felony, though not in the presence of the arresting officer; (3) when a felony has been in fact committed, and the arresting officer has reasonable cause for believing the person arrested to have committed it; (4) upon a charge made upon a reasonable cause of the commission of a felony by the party arrested.

"16.   You are instructed that, if an arrest by a police offi-
cer is unlawful, then the person so arrested may resist such
arrest, and may use such force as is necessary to prevent the
arrest; but in such resistance the person so arrested is not
justified in using a deadly weapon, unless the conduct of the
officer is such as to raise in the mind of a reasonable person,
situated as was the defendant, the reasonable belief that he
is about to suffer death or great bodily harm at the hands of
such officer, whereupon he, as in any other case, may act in
self-defense for the purpose of protecting his person from in-
jury, and may offer such resistance to the force used or threat-
ened against him as to him is apparently necessary to prevent
the threatened injury, to wit, death or great bodily harm;
and if in such a case the person so arrested shoots and kills
the officer, under such circumstances as to constitute self-
defense as herein defined, then the law does not hold him re-
sponsible for the act, and he should not be convicted.  If the
arrest is lawful, the police officer making the same is justified
in using such force as is reasonably necessary to secure and
detain the person arrested, or to prevent his escape, or to
recapture him if he escapes."

The facts and circumstances which led up to and culminated
in the arrest of defendant, so far as material here, are as
follows: The defendant at about eight o'clock in the morning
of June 25, 1913, the morning of the homicide, had an alter-
cation with one Pete Massi in a saloon in this city, and, ac-
cording to defendant's version, a fight ensued between them.
Defendant testified that Massi was in the act of striking him
with a beer bottle when he, the defendant, drew a razor from
his pocket.

"Q.  What did you grab the razor for?  A.  Because I was
afraid of him.  Q.  How did you think the razor would help
you?  A.  Because he might throw away the bottle if he saw
the razor in my hand.  *  *  *  I did not intend to use it.
I thought Pete Massi would turn me loose as soon as he saw
the razor.  I did it to scare him.  Q.  Did you cut him with
it.  A.  I don't remember."

Charles Fina, the proprietor of the saloon in which the
trouble occurred, and who in a general way observed what

happened between defendant and Massi on that occasion, testified:

"Pete had Johnnie down on the floor  *  *  * · in a kind of sitting position.  *  *  * I did not see any blows struck,  *  *  * I told them, 'You people cut that out.' They got up and came in front of the bar, and Johnnie called Pete and said, 'Let's have a drink.' After the drinks Pete said, 'I am cut on the shoulder.' He took back his shirt, and there was a little bit of a wound there—merely brought blood. It made him mad, and he wanted to use my telephone. I said, 'You can't do it; you use no telephone here to call officers.' After the drinks they went out. Q. Was there any bruise or injury of any kind to either of the parties, other than you have stated? A. No, sir."

Cross-examination:

"He (Massi) was holding Johnnie down. He was over Johnnie—Johnnie was on the bottom. Q. And you made him get off?  *  *  * A. I did not make—I asked him to. I said, 'If you want to fight, take it out of doors with you; there will be no fighting in here.' Q. You saw the defendant do nothing? A. Do nothing direct.  *  *  * Q. Pete had an empty bottle in his hand, striking at John? A. No, sir; I could not see no empty bottle; no, sir."

The undisputed evidence, therefore, shows that these parties, in anger, engaged in a "scuffle," and according to defendant's evidence, a fight; that Massi threw defendant onto the floor in a sitting position, and while he had him in that position defendant drew a razor which he happened to have in his pocket; that immediately after the scuffle ceased Massi discovered that he was cut on the shoulder, and was in the act of telephoning to the police, but was prevented from so doing by the proprietor of the saloon in which the trouble occurred; that after the difficulty, and before he was arrested, the defendant dispossessed himself of the razor. He testified, however, that he did not remember what he did with it. The fact that he immediately after the difficulty, in some manner which he failed to disclose, although given an opportunity to do so, disposed of the razor, was at least an incriminating circumstance, when considered in connection with other evidence

respecting the difficulty in the saloon.  I think the only rea-
sonable conclusion deducible from these facts is that the
wound on Massi's shoulder was inflicted by the defendant with
the razor.  In determining whether Officer Griffiths acted with-
in the authority conferred on him by law in making the arrest,
the question of whether Massi or the defendant was the ag-
gressor in the scuffle is not of controlling importance.  The
officer was not required to examine into the merits, examine
witnesses, etc., and in effect judicially decide which of these
parties, Massi or the defendant, was at fault, before making
the arrest.  Section 4195, C. L. 1907, provides that:

"Every person who, with intent to do bodily harm, and
without just cause or excuse, or when no considerable provo-
cation appears, or when the circumstances show an abandoned
or malignant heart, commits an assault upon the person of
another, with a deadly weapon, instrument, or other thing,
is punishable by imprisonment in the state prison," etc.

The undisputed facts, as I read the record, are amply suffi-
cient to support a finding by a jury that defendant assaulted
Massi with a razor.  And a razor when used as a weapon is
a "deadly instrument or thing."  The officer, therefore, was,
under section 4637, C. L. 1907, authorized to arrest the de-
fendant when his attention was called to the assault.  The
question of whether the assault was without "just cause or
excuse," or whether there was any "considerable provoca-
tion" for it, were questions which as stated, the officer was
not called upon to determine before taking the defendant into
custody.

Counsel for defendant seem to contend, if I correctly under-
stand their position, that the officer was not informed that
the defendant had assaulted Massi with a razor, and hence
the arrest was unlawful.  While there is no direct evidence
that the officer was advised of the assault, except the action
of Massi in exhibiting to the officer at the time the arrest
was made, the wound on his shoulder and making the remarks
in relation thereto herein set forth, yet the only inference
permissible, as I view the evidence, is that he was informed
of the assault, and that he was acting on such information
when he placed the defendant under arrest.  Moreover, de-

fendant, according to his own admissions, was, at the time he was arrested, in an intoxicated condition, and was carrying a concealed deadly weapon with the intention, in case certain contingencies should in his opinion arise, of using it against a fellow man. His counsel, in their brief, correctly reflect portions of the record, wherein they say that the defendant, at the time he had the difficulty with Massi, "had partaken of six drinks of whisky; he was ill, he had not breakfasted, and his system was not in a condition to resist the effects of the alcohol of which he partook;" that immediately after the difficulty with Massi "he went up town * * * and purchased a gun"; that on his return down town he stopped at a saloon and "took two drinks of whiskey," spoke to the bartender of the difficulty he had had that morning with Massi, and stated to him that he "had bought a gun to protect himself with"; that from the saloon he went to and entered a restaurant, adjoining and contiguous to the saloon, in which he, two hours before, had the difficulty herein referred to, with Massi, took a seat on a box in a room between the dining room and kitchen, and sat there about 15 minutes, when he was arrested by Officer Griffiths; "that the defendant unquestionably at this time was intoxicated." It is therefore admitted that at the time defendant was arrested he had eaten nothing since the evening before; that he was physically weak, and because of his trouble with Massi and the effects of the seven or eight drinks of whisky which he had partaken of within the space of two hours, was in a "confused condition of mind," and had concealed on his person (in violation of law) a deadly weapon which he had purchased and was carrying with the intention of using against a fellow being in case, in his judgment, certain contingencies should arise. The evidence shows that he was in a desperate and dangerous state of mind (his act in shooting down the officer a few minutes after he was arrested shows this); also, that he was in a somewhat intoxicated condition. His counsel vigorously contend, in their printed brief, that his mind at the time of the arrest was at least partially dethroned, and that he was not wholly responsible for his acts. The carrying of the deadly

weapon was a continuous offense, and was under the admitted facts committed in the presence of the officer.

We are told, however, that an arrest made under these circumstances is unlawful. I am unable to approve of any such doctrine. It is settled by the great weight of authority that under statutes similar to ours an officer may arrest without a warrant a person when he has reasonable grounds for believing him guilty of having committed a felony. In Murfree on Sheriffs, Section 1161, the author says that a peace officer "upon reasonable suspicious, founded either on his own knowledge, or the information of others, that a felony has been committed, or such a breach of the peace as will amount to a felony, he may arrest without a warrant." In 3 Cyc. 878, the rule is stated as follows:

"A peace officer may * * * arrest without a warrant one whom he has reasonable or probable grounds to suspect of having committed a felony, even though the person suspected is innocent"

—citing many cases, both of American and English courts.

I am clearly of the opinion that Officer Griffiths, in making the arrest, did not exceed his authority, and that the court should have so instructed the jury.

Let it be assumed, for the sake of argument, that the officer acted too hastily—exceeded his authority—by arresting the defendant in the first instance. He nevertheless, when the defendant, in trying to escape, was overtaken and exhibited the revolver, not only had the right, but it was his duty, to arrest and disarm the defendant. And the defendant could not, under the guise of defending himself or otherwise, legally resist the arrest. As I read the record, the law of self-defense is not involved in this case. The court, therefore, by instructing the jury on the law of self-defense, and by submitting to them the question of whether the arrest was lawful or unlawful, committed error favorable to the defendant, and which could not have prejudiced his rights.

Counsel for defendant have devoted much space in their printed brief to the contention that at the time of the homicide the defendant was greatly excited, "terrified," and that he "honestly believed that his life was in danger, or that he

was in danger of suffering great bodily harm, at the hands
of Massi, and, acting under such fear, fired the shots which
resulted in the death of Griffiths,'' and hence the act could
not amount to more than manslaughter.  There is not a scin-
tilla of evidence in the record to justify the  belief on the
part of the defendant that he was in any danger whatever
of receiving bodily harm at the hands of Massi from the
time he was arrested until he tried to make his escape.  The
conduct of Massi in going for an officer, instead of taking the
law in his own hands and trying to punish the defendant
for some real or imaginary wrong which he may have believed
he had suffered from the act of the defendant, was, or should
have been, proof conclusive that he (Massi) had no intention
of resorting to personal violence against the defendant.  And
the officer did not, nor did he attempt to, search the defend-
ant, who was under his protection, as well as in his custody.
Defendant testified that at the time of the altercation in the
saloon, about two hours before the arrest was made, Massi
threatened to kill him before night, and, believing that his
life was in danger, he purchased and armed himself with
a revolver for the purpose of resisting the attack which he
honestly believed would be made by Massi on his life.  The
jury might well have concluded that if the facts respecting
defendant's trouble with Massi had been as he claimed they
were, and that he was induced to purchase the gun because
of threats made against his life by Massi, he would have
welcomed the presence of the officer, and would not, when
arrested, have tried to escape and get from under the pro-
tection of the officer.  The jury also might well have con-
cluded that defendant knew, or had good reason for believ-
ing, that when taken to the police headquarters he would be
given an opportunity to explain his entire course of conduct
that morning, as well as make known to the officers the threats
of Massi, if he made any, against his life, and have him appre-
hended and dealt with according to law.  Moreover, the con-
duct of these parties—what each of them did—immediately
after the termination of the row between them in the saloon,
may have weakened, if it did not entirely destroy, the proba-
tive force of the evidence of defendant respecting threats

which he claimed Massi made against his life, and that he honestly believed his life was in danger. As I have pointed out, the record shows that as soon as the row ceased Massi endeavored to use the telephone in the saloon to call a peace officer, but was prevented from so doing by the bartender. About this time both Massi and the defendant left the saloon, and in about two hours thereafter the defendant returned to the saloon with a loaded revolver concealed on his person, and a little later Massi appeared on the scene in company with Officer Griffiths. These circumstances alone, which are not in dispute, were sufficient to support a finding by the jury that, if either of these parties was in danger of being assaulted by the other, Massi was the one in danger, and not the defendant.

I am of the opinion that the instruction (No. 14) respecting intoxication, which is assigned as error, clearly and correctly stated the law on that subject, and that the jury could not have been misled or confused thereby respecting the purpose for which the intoxication of the defendant might be considered.

The court, after giving the jury the statutory definitions of first and second degree murder, very fully, and I think correctly, defined the terms "deliberate" and "premeditated" These instructions are inserted in full further along in this opinion. The court's instruction (No. 6) defining "premeditation" is assigned as error. It is vigorously contended on behalf of defendant that the instruction obliterates the distinction between first and second degree murder. Of course, if such is its effect, the giving of it was and is prejudicial error. But does it have that effect? I think not. In support of the contention that the instruction does not properly distinguish between the two degrees of murder, the following cases are cited: *State* v. *Greenleaf,* 71 N. H. 606, 54 Atl. 38; *State* v. *Hockett,* 70 Iowa, 442, 30 N. W. 742; *State* v. *Carr,* 53 Vt. 42; *People* v. *Majone,* 91 N. Y. 211; *Allen* v. *United States,* 164 U. S. 495, 17 Sup. Ct. 154, 41 L. Ed. 528; *State* v. *Rutten,* 13 Wash. 203, 43 Pac. 30; *State* v. *Moody,* 18 Wash. 165, 51 Pac. 365; *Ross* v. *State,* 8 Wyo. 384, 57 Pac. 931.

In *State* v. *Greenleaf* it was contended on behalf of defend-

ant that the evidence in the case did not justify a verdict of murder in the first degree, and the court, in the course of its discussion of the merits and the principles of law applicable to the case, said:

"As to the element of deliberation and premeditation, while it need not be shown that the killing was deliberated and premeditated for any particular length of time, * * * yet we think it is quite evident, from the kinds of murder which the statute specifically designates as deliberate and premeditated, * * * that the Legislature used the words 'deliberate and premeditated' * * * in their natural and ordinary sense, and intending to exclude from the operation of the death penalty murder committed on the impulse of the moment, without actual deliberation and premeditation."

This is substantially all that the court said on the question of ''premeditation and deliberation.'' As I read the case, it neither approves nor disapproves of the test that the jury in the case at bar were instructed they might make in determining whether the killing of Griffiths was with or without premeditation.

In *State* v. *Carr* the court said:

"If it [the killing] was premeditated, it would be murder in the first degree. That is to say, if the killing was murder, then, if it was done with premeditation, it would be in the first degree. That term, 'premeditated,' was not meant to require any particular length of time that such premeditation should have been going on prior to the fatal act. But if, in fact, it did precede the act, it gave character to the crime."

The court, in that case, quotes with approval from the case of *Commonwealth* v. *Daley*, 2 Pa. Law J. 156, as follows:

"Deliberation and premeditation simply mean that the act was done with reflection and conceived beforehand. No specific length of time is required for such deliberation. It would be a most difficult task for human wit to furnish any safe standard in this particular. Every case must rest on its own circumstances. The law, reason, and common sense unite in declaring that an apparently instantaneous act may be accompanied with such circumstances as to leave no doubt of its being the result of premeditation."

Likewise, in the case of *People* v. *Majone*, there are expressions which seem to support rather than disapprove of the

instructiion. In that case the court, among other things, said premeditation—

"must be sufficient for some reflection and consideration upon the matter, for choice to kill or not to kill, and for the formation of a definite purpose to kill. And *when the time is sufficient for this, it matters not how brief it is. The human mind acts with celerity which it is sometimes impossible to measure*, and whether a deliberate and premeditated design to kill was formed must be determined from all the circumstances of the case." (Italics mine.)

There is nothing in the case of *Allen* v. *United States* that is either for or against the instruction in this case respecting deliberation and premeditation. All that is said on the subject is:

"Where the crime (murder) is classified, as in some states, proof of deliberate premeditation is necessary to constitute murder in the first degree."

In *Ross* v. *State* the court instructed the jury:

"The law does not require that the willful intent and premeditation shall exist any particular length of time before the crime is committed. It is sufficient if there was a design and determination to kill distinctly formed in the mind of the defendant at any moment before or *at the time* the shot was fired."

The phrase I have italicized makes the instruction in that case clearly distinguishable from the instruction in the case at bar. The court there held, and properly so, that:

"A design and determination to kill, distinctly formed in the mind *at the time the shot was fired* is not sufficient to constitute premeditated malice." (Italics mine.)

Where the formation of the design—intent—to kill and the killing are concurrent, or, as stated in the instruction in that case, the "design and determination to kill" are formed in the mind "at the time" of the killing, premeditation cannot exist, and the killing, under such circumstances, cannot be more than murder in the second degree.

The two Washington cases cited, *State* v. *Rutten* and *State* v. *Moody*, hold that an instruction such as the one given in this case ignores—"wipes out"—the distinction between the

two degrees of murder.   The Washington court, however, in the case of *State* v. *Straub,* 16 Wash. 111, 47 Pac. 226, approved an instruction wherein the court charged that:

"Malice is deliberate and premeditated *when it has been dwelt upon at all in the mind,* and when the motive or consideration moving to his act has been *to any extent mentally weighed.   Premeditation may be as quick as thought in the mind of man."*

The Washington court again, in the case of *State* v. *Moody, supra,* approved this instruction.   The court, however, makes a distinction which I think is more subtile than substantial between the instruction in the Stroub Case and the instructions given in the Rutten and Moody Cases.   In the Rutten Case the language condemned was as follows:

"In deliberating there need be no appreciable space of time between the intention to kill and the act of killing.   That may be as instantaneous as the successive thoughts of the mind."

In the Moody Case the language disapproved was:

"All that is necessary is that the deliberate and premeditated intent be formed before the fatal wound is inflicted.   It matters not if the wound be inflicted immediately after the forming of the intent. The forming of the deliberate and premeditated intent, and the inflicting of the mortal wound, may follow each other as rapidly as the successive thoughts of the mind."

In the Stroub Case the language approved was:

"Premeditation is the mental operation of thinking upon the act before doing it.   *   *   *   Premeditation may be as quick as thought in the mind of man."

The same court, in the case of *State* v. *Gin Pon,* 16 Wash. 425, 47 Pac. 961, approved of an instruction containing the following language:

"The premeditation and reflection thereon may take place but a moment before the doing of the act, but both states of mind must have actual existence to make the offense murder in the first degree."

I think it is apparent that the same thought is expressed in the instructions given in the four cases.   And they seem

to be the only cases cited that disapprove of, or that criticise the instruction given in this case.

In 21 Cyc. 726, the principle here involved is illustrated as follows:

> "Deliberate and premeditated means thought over, considered, or reflected upon beforehand. Hence it is not enough that the design to kill existed at the time of the killing, but it must have been formed before it was put into execution. But if the design to kill has been deliberately formed, the murder will be of the first degree, although that design is instantly carried into effect. Since a deliberate purpose can be formed in an instant, no particular length of time for deliberation and premeditation is required by the law."

Many cases supporting the text are cited in the footnotes on pages 727, 728 and 729. I also invite attention to the many excerpts from recent decisions contained in 3 Words and Phrases (Second Series) 494-496.

In *State* v. *Morgan*, 22 Utah 162, 61 Pac. 527, this court, speaking through Mr. Justice Miner, said:

> "A man may do a thing willfully, intentionally, maliciously, and deliberately from a moment's reflection, as well as after pondering over it a month. He may think and premeditate before doing the act, and do it the same instant he conceives the criminal purpose, as well as if he had premeditated over it for a long time. The statute fixes no time when the deliberation and purpose to kill shall have been formed before the act of killing shall take place."

In the case of *People* v. *Calton*, 5 Utah at page 458, 16 Pac. at page 906, Chief Justice Zane, speaking for the court, said:

> "The intent essential to murder is the state of mind—the intention at the time of the act that causes death. The law does not require deliberation after the intent, and before the act of killing. It does require that a man shall be able and have opportunity to think about the killing, that he may deliberate and premeditate upon it; and whenever the deliberation is sufficient to form therefrom a specific and well-defined intention to kill the person afterwards slain, it is enough to characterize the killing as murder in the first degree."

This is a correct statement of the law on this subject as I understand it. The deliberation and premeditation may take place before as well as after the intent to kill is fully formed

in the mind. For example, suppose a person having some real or imaginary grievance against a fellow being, and his feelings are so wrought up and are so intense toward the person against whom he is aggrieved that he conceives the idea of killing him, and while deliberating and premeditating as to whether to kill or not to kill he unexpectedly meets the party and instantly decides to kill him, and at the very moment the intent to kill is formed he, without provocation or excuse, carries it into execution and kills the party; would not a jury, under such circumstances, be justified in finding the slayer guilty of murder in the first degree? Undoubtedly it would. And this would be so, even if there were "no appreciable space of time between the intention to kill and the act of killing," and the intention to kill and the act of killing may have been "as instantaneous as the successive thoughts of the mind," as charged in the case at bar.

The uncertainty created by the Washington decisions referred to arises because they seem to hold, if I correctly grasp the import of them, that there must be some deliberation and premeditation after the design and intent to kill has been formed in the mind in order for the killing to constitute murder in the first degree. And my brethren here seem to have fallen into the same error. As stated, the intention to kill may be the result of, and may be formed after, the deliberation and premeditation.

Since the instruction in this case is held error, and the cause is to be reversed and remanded to the lower court for a new trial, the question arises: What space of time within the meaning of the law is "appreciable," and what is the minimum space of time that can elapse for premeditation after the intent to kill is formed in the mind and the act of killing to make the killing murder in the first degree? Is the fraction of a second sufficient, or does it require one, two, three, or more seconds? I think the trial court should be advised on this point; otherwise, the error may be repeated, or a more glaring one committed, on a retrial of the cause. It may be said that the prevailing opinion furnishes a sufficient guide in that regard. But does it? The test is: Would

an instruction couched in the language of the prevailing opinion express a different thought, or the same thought in plainer and less uncertain language, than that expressed in the instruction given. By placing in columns, and side by side, the instruction given and what is said in the prevailing opinion suggesting in a general way as to what a proper instruction on the subject should contain, I think it will be observed that, while there is a variance in the phraseology of the opinion from that of the instruction which, if followed, would change the form, but not the substance, of the instruction, the same idea is conveyed—the same thought expressed—in the two columns respecting the term "premeditation." Therefore, as I view the case, for the prevailing opinion to go down in its present form will tend to confuse, rather than enlighten, the trial court on this point.

Copied from Prevailing Opinion.

"No attempt should be made to fix any *definite space of time* which is necessary to constitute the premeditation required by our statute. * * * Why not tell them (the jury) that while it is not necessary that there be any *definite or fixed period of time* for premeditation, and that *no fixed or definite time can be stated,* yet that some space of time, however brief, for premeditation, is necessary before the fatal shot is fired or the fatal blow is struck, and that if they find that there was a fixed design or purpose in the mind of the accused to kill *for any space of time, however brief,* before he commit-

Instruction (No. 6) as Given by the Court.

"Deliberate means a cool state of the blood, a state of mind contradistinguished from heat or sudden passion, caused by great provocation. It does not, necessarily, include within its import brooding over, considered, or reflected upon for any considerable length of time, but it means an intent to kill, executed by the party not under the influence of a violent passion, suddenly aroused, but in the furtherance of a formed design to gratify a feeling of revenge, or to accomplish some other unlawful purpose.

"Premeditation means *any length of time, however thought of beforehand, for*

ted the fatal act, and that he committed the same pursuant to such design or purpose, then the killing would constitute murder in the first degree.'' (Italics mine.)

"The jury should also be informed in that connection that in determining the question of such design and premeditation they should take into consideration all of the facts and circumstances developed at the trial.''

*short.* There need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as the successive thoughts of the mind. It means a specific intention to take human life, *thought of beforehand.* If there is such a design, or determination to kill, deliberately formed in the mind at any moment *before the fatal act is done,* it is sufficient.'' Excerpt from Instruction No. 23.

"It is your duty to consider the evidence all together, fairly and impartially and conscientiously, a n d y o u should arrive at your verdict solely from the evidence introduced upon the trial.'' Instruction No. 24.

"These instructions are to be considered all together, as a whole, carefully and conscientiously. You should not single out one part and give it undue weight. All the law on a particular subject may not be stated in a particular paragraph or in a single instruction.

"The different subjects discussed in the instruction should be kept in mind, and the evidence considered and weighed in the light of all the instructions.''

It is suggested that what I have said ''shows that the writer of the (this) opinion regards the question of time as one of law rather than one of fact.'' Since what I have said on this point is susceptible of a construction just contrary to what I intended should be given the language used, I shall endeavor to make plain my position and to convey the thought intended. The idea I intended to convey is this: That the question of whether there was deliberation and premeditation, of either long or short duration, is purely a question of fact for the jury. And this is what I think the court, in substance, charged the jury in this case, namely: That where the intention to kill follows and is the result of deliberation and premeditation, then ''there need be no appreciable space of time between the intention to kill and the act of killing; they may be as instantaneous as the successive thoughts of the mind.'' The logic of the prevailing opinions, as I read them, is that there must be ''appreciable time between the intention to kill and the act of killing.'' I was, and am still, of the opinion that it is the prevailing, and not the dissenting opinion that holds that the ''question of time is one of law rather than one of fact.'' If the court erred in charging the jury that ''there need be no appreciable space of time,'' etc., it is because there must be, as a matter of law, some ''appreciable time.'' And I therefore repeat that the question arises, What space of time, within the meaning of the law as thus declared by the prevailing opinions, is ''appreciable''?

The instruction given in this case contains the following propositions: (1) That ''premeditation means thought of beforehand''; (2) that a ''design or determination to kill, deliberately formed in the mind at any moment before the fatal act is done,'' is sufficient to constitute murder in the first degree; (3) that the act of killing after the intention is deliberately and premeditatedly formed in the mind may be ''as instantaneous as the successive thoughts of the mind.'' Under practically all of the authorities, as I read them, this is a correct statement of the law on the question under consideration in this class of cases. Furthermore, the instruction is predicated on substantial evidence. The contention,

therefore, of counsel, that the jury were not warranted in finding that the killing was deliberate and premeditated, is untenable. I have examined the record with more than ordinary care, and am convinced that here is abundant evidence to sustain the verdict. One witness, who was in the vicinity of the place where the homicide occurred and saw the shots fired, testified that while she was in the act of emptying a tub of water from an "upstairs" window her attention was attracted by two men "hollering"; that she saw Officer Griffiths and the defendant standing facing each other; that Griffiths had hold of defendant's shoulder; that she heard some one say, "Stand back!" that Griffiths held up his police club, and said, "Hands up!" and immediately thereafter the shots were fired. Another witness, who claimed that he saw the last one of the three shots fired that killed Griffiths, testified that:

"After the third shot was fired, and before the officer's body came to the ground, the defendant backed off a few feet facing the officer, and after the officer had fallen, he turned * * * and went south. I saw the revolver in the possession of the defendant. As he was backing, the revolver was pointed directly out in the direction of the officer."

Another witness also testified to substantially the same thing. This evidence, considered in connection with other evidence in the case, is amply sufficient to sustain a verdict of murder in the first degree.

The assignment of error directed to the admission in evidence of the articles referred to in the prevailing opinion, found in defendant's room a few hours after the homicide occurred, presents a more serious question, and, with the exception of the assignment directed to conduct of counsel in propounding objectionable questions, referred to in the prevailing opinion, and objectionable remarks made by counsel during the progress of the trial, and excepted to by defendant, is the only assignment, as I read the record, that contains any substantial merit. The finding of these articles in defendant's room did not prove, nor tend to prove, any material fact, nor were they pertinent to any issue in the case. The jury might well have concluded from this evidence, con-

sidered in connection with the facts and circumstances lead-
ing up to and surrounding the killing of Officer Griffiths, that
the defendant was a professional "gunman," "thug" and
"hold-up"; and this evidence may have been, and probably
was, very persuasive in influencing the jury to withhold a
recommendation of life imprisonment, if any one or more of
them otherwise felt so inclined.    The fact that defendant,
while testifying, "voluntarily undertook to explain the pres-
ence of these articles in his room" (excepting the two masks
and the coat, of the presence of which he denied having any
knowledge), did not cure the error, or render it harmless.
After the evidence of the finding of this paraphernalia, gen-
erally supposed to be used by highwaymen in their career of
lawlessness, in defendant's room, he, in order to avoid its dam-
aging effect, was called upon to explain its presence there.
The fact that he endeavored to give a satisfactory explanation
of the presence of some of the articles in his room and denied
that he had any knowledge of the others did not, as stated,
render the error harmless.    As I read the record, his denial
and much of his explanation intensified, rather than neutral-
ized, the damaging effect of this evidence.    The Attorney Gen-
eral contends that the evidence respecting the presence of the
articles in his room was admissible to show motive for the
commission of the homicide.    The defendant's entire course
of conduct, from the time he broke away from Officer Grif-
fiths until he was arrested several hours later, shows that his
motive in killing the officer was to make good his escape.    Un-
der such circumstances the state is not required, nor would
it be proper for it, to show that the defendant may have, and
probably had, committed crimes other than the one for which
he is on trial to show motive for the murder.

I concur in the reversal of the judgment on the ground
that the articles mentioned were not admissible in evidence,
and that the court committed prejudicial error in receiving
them in evidence, and on the further ground that the objec-
tionable remarks made by counsel for the state, and the ob-
jectionable questions propounded by him to witnesses during
the progress of the trial (which are referred to in the prevail-
ing opinion), were prejudicial to the rights of defendant.

Since the foregoing was drafted, the Chief Justice has written an opinion concurring in the conclusions reached by Mr. Justice Frick. If the opinion correctly reflects the scope of the powers and duties of peace officers in making arrests, then I submit that this state will be, until the law is changed in that regard, a haven and in a metaphorical sense a "city of refuge" for thieves, thugs, burglars and criminals generally. Under the law as thus declared the most dangerous and desperate criminals may have their rendezvous in our cities and incorporated towns, they may with impunity and in violation of law carry, concealed on their persons, deadly weapons with which to strike or shoot down any person—officer or layman—who may have the temerity to resist or interfere with them when in the act of committing crime. Should one of these be pointed out as a person who has recently committed a felony, and some evidence of the alleged crime is furnished the officer, as was done in the case at bar, the officer, before he could lawfully put the party under arrest, must either go before some magistrate, file a complaint charging the accused with having committed the crime alleged, and obtain a warrant, and give the party an opportunity in the meantime to make his escape, or make inquiry respecting the merits of the accusation and in a sense judicially determine whether the party accused is guilty of an offense. Should the officer erroneously decide that the party ought to be placed under arrest, and proceed to arrest him without a warrant, the party about to be arrested may resist the officer, and may make use of whatever force may be reasonably necessary to prevent the arrest, and if, in doing so, he uses the deadly weapon which he is carrying concealed on his person in violation of law, and kills the officer, and the killing was necessary in order to prevent the arrest, it is justifiable homicide. I venture the satement that there is not a state in the Union, except Utah, where such a startling proposition has ever been held to be the law, and until the present it has never been so declared in this state.

It may be said that these deductions and conclusions are somewhat extravagant, and are not warranted by the opinion. Let us look at the record and see if they are. It may be

fairly inferred from the evidence that Griffiths, at the time he was killed, was using and intended to use whatever force was necessary to arrest the defendant. Now the Chief Justice holds, as a proposition of law, that the arrest of the defendant was unlawful. He also holds that where an officer proceeds to make an unlawful arrest the party about to be thus restrained of his liberty may lawfully resist the officer, and in so doing may use whatever force may be reasonably necessary to prevent the arrest. In the case at bar I think the only reasonable conclusion permissible from the evidence is that the only thing the defendant could do to prevent the officer and Massi from taking him into custody after he made his escape was to kill the officer. Therefore, according to the logic of the opinion written by the Chief Justice, the killing of Officer Griffiths was, under the circumstances, justifiable homicide, and the court erred in refusing to direct the jury, as requested by defendant, to return a verdict of not guilty. It therefore necessarily follows, if such is the law, that in this case, and in all similar cases, the officers, and not the criminals whom they are trying to arrest, are the real offenders against law and order.

The inevitable baneful effect—far-reaching consequences—of such a rule, as I view it, may be at least partially appreciated by keeping in mind the location of this state geographically with reference to many of the other states. Salt Lake City, Ogden and other somewhat populous municipalities of the state, situated, as they are, on the trunk lines of the great railway systems of the country, which lines extend from the Atlantic Ocean on the east to the Pacific Ocean on the west, make of these cities and municipalities, a natural stopping (resting) place for tourists, business men, and people generally passing through the state on their way from one coast or part of the country to another. It is a matter of common knowledge that the people of this state, acting through their commercial, social and professional clubs, and their business, religious and social organizations, have extended a standing invitation to the traveling public who may pass through the state to "stop over" on their journey and "get acquainted," with the assurance that a cordial and hearty welcome will be

extended to all respectable people who chance to avail them-selves of this state-wide invitation. It necessarily follows that many professional criminals from other parts of the country take advantage of the situation and "stop over," not for the purpose of "getting acquainted," but to follow their vocation of fleecing and robbing tourists and other people who may be visiting the state, as well as burglarizing and pillaging homes, and robbing and committing other crimes against the people of the state. I therefore repeat that, if the opinion written by the Chief Justice reflects the law as it shall be enforced in the future by the peace officers in dealing with the criminal element, it seems to me that the state will be an oasis for thieves, thugs, hold-ups, burglars, and criminals generally, who, until they commit some crime and are apprehended therefor, are given the freedom of our cities. Should one of them be pointed out as a person who has committed a felony, before the officer could lawfully arrest the party, he would be compelled to go before some court or magistrate, file a complaint, and obtain a warrant, and thereby give the crim-inal an opportunity to "move on" and make good his escape.

Let us see if the application of the law, as it is declared by the Chief Justice, to the facts of this case, does not fully support what I have said regarding its application to like cases in the future. The defendant, according to his own testimony, was engaged in a saloon brawl or fight, and when he saw that Massi was getting the best of the fight he drew from his pocket a razor and opened it for the purpose, as he says, of protecting himself. When he and Massi, at the re-quest of the bartender, ceased fighting, it was discovered that Massi was cut on the shoulder, and Masis then and there started to put in a telephone call for for a peace officer, but was prevented from so doing by the bartender. Massi and the defendant then left the saloon. The defendant, in some way which he failed to disclose, disposed of the razor, went "up town" and purchased a revolver, and returned with it concealed on his person, in violation of law, to the immedi-ate vicinity of where he had the trouble with Massi. Soon thereafter Massi returned to the place accompanied by Offi-cer Griffiths. The officer placed his hand on the defendant's

shoulder and said, "What is the matter, boy?" Massi directed the attention of the officer to the cut on his shoulder, and said, "That's what's the matter." The officer then said, addressing the defendant, "You had better come with me," and placed him under arrest. There is some evidence to the effect that, when the officer arrested the defendant, he "grabbed him by the shoulder  *  *  * in rather a rough manner and pulled him into the outer room." The jury might well have concluded, from the civil manner in which the officer approached the defendant, and the kindly and gentlemanly way in which he addressed him, as indicated by the language used when he placed the defendant under arrest, that he used no more force than was absolutely necessary. The officer did not even subject him to embarrassment and humiliation by searching him in the presence of his friends and acquaintances. It may be said, however, that for the officer to have searched and disarmed the defendant would have been a further unlawful encroachment on his inherent and constitutional rights; and it necessarily follows that, if the arrest in the first instance was unlawful, any further invasion by the officer of the person of defendant, or an interference with his property, would have been unlawful. It nevertheless is apparent that, if the officer had been less considerate and forbearing, and had searched the defendant and disarmed him, the officer would not have been killed, and the defendant would not be under sentence of death. As hereinafter stated, a few moments after the defendant was arrested, he broke and ran away from the officer, and when the officer was in the act of rearresting him he turned and shot the officer, killing him almost instantly.

Reference is made to evidence tending to show that at the time the shots were fired the officer had hold of the defendant, with his club raised as if in the act of striking him. From this it is suggested, and by counsel urged, that the defendant may have been terrorized, and was in fear of receiving great bodily injury at the hands of the officer, at the time the fatal shots were fired. The evidence shows that the defendant discharged the gun with his left hand, his right having been cut and partially disabled with the razor, which the

facts, as I read the record, tend to show that he used on Massi in the saloon. Keeping in mind the partial disability of the defendant, and the attitude and demeanor of the officer towards the defendant up to this time, and the celerity with which the officer could have used his club, which he undoubtedly carried in his hand ready for instant use, the jury might well have concluded that the defendant drew his revolver before the club was raised, and before the officer had an opportunity to use it. In other words, the jury were warranted under the circumstances in concluding that, if the officer had had his club raised at the time the gun was drawn, he could, and probably would, have dealt the defendant a crushing blow and prevented him from using the weapon, and that he raised his club to protect himself, but was too late. The officer, as I view the case, neglected a duty he owed to his family, himself, and to the state by not having his gun in his hand, instead of his club, and shooting the defendant down when he started to draw his revolver.

As I view the evidence, and understand the law applicable thereto, the arrest made by Griffiths was as clearly within the law, and in the line of official duty, as was the arrest of defendant by the officers a few hours after the homicide. There was, however, this difference in the cause for these two arrests, which in no way affects the legal phase of the question. When the first arrest was made, the circumstances pointed to the commission by defendant of one felony only, but, when the second arrest was made, the facts and circumstances, as I read the record, tended to show that defendant had committed two felonies. In fact, when finally arrested, he had added a third to his list. His attempt to draw his revolver and shoot the officer making the arrest was, within the meaning of the law, a felony. While it is true that the defendant is not on trial for carrying concealed on his person a deadly weapon in violation of the law, or for assaulting Massi or the officers, the evidence relating to these transactions is, nevertheless, germane to the case. It tends to show, among other things, that the defendant is not the gentle, peaceable, harmless and inoffensive person that some of the witnesses claimed him to be.

Reference is also made to evidence tending to show that Massi may have been armed with a gun, and that he made threats in the saloon at the time he and defendant had the row, herein referred to, to the effect that he intended to and would kill the defendant before night. The question of whether Massi was armed or unarmed at the time Griffiths arrested the defendant cannot, as I view the record, have any bearing, directly or indirectly, on the case. The defendant is not charged with having killed Massi, nor does the evidence show that there was anything said or done by either the officer or Massi, from the time the defendant was arrested until the officer was killed, to justify a belief that the defendant was in any danger whatever of either losing his life or of suffering bodily injury at the hands of Massi. The conduct of Massi, what he did from the time the row he had with the defendant in the saloon was over until Griffiths was killed, tends to show that he did not have a gun. Assuming, for the sake of argument, that he did have a gun, his conduct tends to show that he had no intention of using it against the defendant. When Officer Griffiths was shot and fell to the ground, Massi was, at most, only a few feet from the defendant, and undoubtedly had an opportunity to shoot him down, and under the circumstances he would have been justified in so doing. But he did not do so. Nor is there a scintilla of evidence that he there made any attempt to either kill or maim the defendant. The jury were therefore amply justified in rejecting as unworthy of belief the testimony of defendant that Massi had a gun and that he had made threats against his life.

The falacy of the doctrine announced by the Chief Justice, I think, will be fully appreciated by applying it to the facts and circumstances under which defendant was arrested a few hours after the killing of Officer Griffiths. There is not a scintilla of evidence that shows, or tends to show, that the officers making the arrest acted under or in pursuance of a warrant issued by a magistrate for the arrest of defendant. Nor is there anything in the record that tends to show that a complaint had been made before a magistrate charging the defendant with any offense. I think it may be fairly in-

ferred, there being no evidence to the contrary, that the officers making the arrest acted without a warrant. Applying the rule of law as announced by the Chief Justice to the facts of this case, as I view them, the killing of Griffiths was nothing more than justifiable homicide, and the defendant was not guilty of any crime. The arrest, therefore, having been made without a warrant, if it was so made, was unlawful; and the defendant, under the rule, was justified in using whatever force was reasonably necessary to prevent the arrest, and having failed to kill the officers, as he attempted to do, it follows that he, as a proposition of law, has a cause of action against them for an unlawful arrest and for false imprisonment. It goes without saying that judicial recognition of any rule that would lead to such an absurdity would be making a travesty of the law, and of justice the worst of mockeries, and which, if followed, would soon bring the law and the courts that administer it into merited contempt.